# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT WINCHESTER

| | | |
|---|---|---|
| **SHELBYVILLE HOSPITAL CORP.,** | ) | |
| **d/b/a THE HOSPITAL CENTER** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **No. 4:13-CV-0088** |
| | ) | |
| **E. WAYNE MOSLEY, M.D.** | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION</u>

This case comes before the Court on the parties' cross-motions for summary judgment.
The Plaintiff, Shelbyville Hospital Corporation d/b/a Heritage Medical Center (hereafter the
"Hospital" or "Plaintiff"), has filed a Motion [doc. 140] for Summary Judgment seeking a full
judgment with regard to its breach of contract claim against the Defendant, Dr. E. Wayne Mosley
(hereafter "Dr. Mosley" or "Defendant"). The Hospital submitted a brief [doc. 142] and a
Statement of Facts [doc. 141] in support of its Motion. Dr. Mosley has submitted responses to
both documents. [docs. 147, 148]. The Hospital filed a reply brief [doc. 156] and its Motion is
now ripe. In accordance with this opinion and the order filed herewith, The Hospital's Motion
[doc. 140] will be **GRANTED**.

Dr. Mosley also filed a Motion for Summary Judgment [doc. 137], with a supporting
brief and Statement of Facts. [docs. 138, 139]. The Hospital responded [docs. 152, 153]. Dr.

Mosley filed a reply brief [doc. 163], and the Motion is now ripe. In accordance with this opinion and the order filed herewith, Dr. Mosley's Motion [doc. 137] will **DENIED**.

The Hospital filed a separate Motion for Summary Judgment [doc. 143], with a supporting brief and Statement of Facts [docs. 144, 145] seeking to preclude Dr. Mosley's affirmative defenses. Dr. Mosley responded in opposition [doc. 149], and the Hospital has replied [doc. 157] and filed a supplemental brief [doc. 164]. The Motion is now ripe. In accordance with this opinion and the order filed herewith, The Hospital's Motion [doc. 143] is **GRANTED**.

## BACKGROUND

This case arises from a contract dispute. The Hospital is a for-profit corporation that operates an orthopedic clinic in Shelbyville, Tennessee. The Hospital is owned by Community Health Investment Co., LLC, which also owns the Shelbyville Clinic Corporation (hereafter the "Clinic"). Dr. Mosley is an orthopedic surgeon. In July 2011, the parties made an agreement (the "Agreement") whereby Dr. Mosley would move to Shelbyville, Tennessee and establish a medical practice. Dr. Mosley would lease office space from the Clinic.

Under the Agreement, Dr. Mosley would engage in a "Full-Time Private Practice of Medicine" in Shelbyville for thirty-six months. (Agreement at Section B.1). The Agreement set out the requirements of Dr. Mosley's full-time obligation, providing that failure to work for more than ten consecutive business days would be a breach of the Agreement (Section B.4). Under the "income guarantee" provisions, the Hospital guaranteed that Dr. Mosley's practice would collect at least $84,416.66 for each of its first eighteen months (the "Cash Collections Guarantee Period" or "Guarantee Period"), or that the Hospital would meet that amount through advancement loans,

up to an aggregate loan total of $1,013,000.000. Following the Guarantee Period, the Hospital would forgive a portion of Dr. Mosley's debt for each additional month of practice for eighteen months (the "Cash Collections Continuation Period" or "Continuation Period"). His debt would be fully forgiven at the end of the thirty-six month period. However, if Dr. Mosley failed to meet his obligations to practice full-time, he would be required to repay the advancements immediately. (Section D.7).

During the negotiations period, Dr. Mosley negotiated with Dan Buckner, the Hospital's CEO. He also communicated with Tisha Rader, the Hospital's Director of Physician Practice Management. On July 19, 2011, Dr. Mosley e-mailed Ms. Rader a list of his "Contract Concerns." [doc. 138-8]. He listed concern with the Full-Time Practice requirements, and with Section B.4's ten-day limitation, noting that "[t]hey need to allow for Reserve service."[1] (*Id.*) The Hospital provided a draft agreement to Dr. Mosley on July 26, 2011 via e-mail (the "July Agreement") [doc. 140-1]. The July Agreement was apparently intended to be the final draft. Dr. Mosley made several hand-written changes to the July Agreement's terms, including changing the number of consecutive days that he would be permitted to miss work from ten to twenty (Section B.4). He also modified the provision that required him to immediately repay the debt if he breached the Agreement by failing to maintain a full-time practice in Shelbyville during the Guarantee period (Section D.6), and crossed out the repayment provision (Section D.7). He signed the July Agreement and returned it. (Mosley Depo. [doc. 140-1] at p. 187). Dr. Mosley testified that he did not inform the Hospital that he had made handwritten changes, because he "thought it would be self-explanatory." (Mosley Depo. [doc. 140-1] at p. 198-99).

---

[1] Dr. Mosley was enlisted in the military reserves.

Dan Buckner, the Hospital's CEO, signed on behalf of the Hospital. Mr. Bucker claims he was unaware of the changes when he signed the July Agreement. (Buckner Affidavit, ¶ 3 [doc. 140-1]; Rader Affidavit, ¶ 3 [doc. 140-1]). The Hospital contends that it became aware of the handwritten terms during the course of this lawsuit.

On August 5, 2011, Tisha Rader e-mailed Dr. Mosley another revised contract (the "August Agreement" [doc. 140-1]), which was again amended to include a pay advance prior to Dr. Mosley's commencing practice (Section D.3). The accompanying e-mail message (e-mail [doc. 140-1]) read:

> Section D3 is the revised verbiage that explains we will pay you one month guarantee prior to Commencement Date. Please sign pages and scan or fax back to me by Monday, Aug. 8. Then either mail the original to me or bring with you when you come next Thursday.

The August Agreement contained a cover page stating that it incorporated the terms and conditions of the earlier contract, which was attached. However, the version of the agreement attached did not contain Dr. Mosley's handwritten revisions[2]. Dr. Mosley signed the cover page, initialed each page, and made a notation that he agreed to the revision in Section D.3. He does not deny that he signed the document, but contends that he did not read the entire contract and believed it incorporated the earlier terms. The parties now disagree on which version of the Agreement controls.

Dr. Mosley began practice in Shelbyville on August 15, 2011, commencing the Guarantee Period. Problems arose almost immediately. There were disagreements over Dr. Mosley's lease with the Clinic. He also contends that the Hospital's actions, including removing

---

[2] Other than Dr. Mosley's handwritten changes and the new payment term in Section D.3, the July Agreement and the August Agreement were identical.

equipment from his office, collecting Hospital payments through his office, and establishing a competing practice with shared office space interfered with his ability to build and grow a practice. He also claims that the Hospital stopped providing him with x-ray imaging services in February 2013, which prevented him from operating his practice. The Hospital paid Dr. Mosley $1,013,000 in advances (the maximum amount under the Agreement) between August 2011 and October 2012.

On November 14, 2012, Dr. Mosley traveled out of the country for a mission trip, returning on December 17, 2012. The Hospital claims that Dr. Mosley's absence during the Guarantee Period was a breach of Section B.4 because he missed more than ten business days. The Hospital also identifies three additional periods between March and August 2013, during which it alleges that Dr. Mosley did not treat patients for more than ten consecutive business days and one period, from July 4, 2013 to August 2, 2013, during which he did not treat patients for twenty-one business days. Dr. Mosley's office manager testified that Dr. Mosley treated patients in Shelbyville only four days in March 2013 (Dortch Depo. at p. 23 [doc. 140-2]), six days in April 2013 (*id.* at p. 27), four and a half days in May 2013 (*id.* at p. 28), two and a half days in June 2013 (*id.* at p. 33), two days in July 2013 (*id.*), three and a half days in August 2013 (*id.* at p. 38), and two days in October 2013 (*id.*) Dr. Mosley testified that he spent some of this time filling in for other physicians in Florida, and that he saw less patients as a result. (Mosley Depo. [doc. 140-1] at p. 175, 179). The Guarantee Period having ended in February 2013, those absences occurred during the Continuation Period.

**STANDARD OF REVIEW**

Rule 56(a) sets forth the standard for governing summary judgment and provides in pertinent part: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The procedure set out in Rule 56(c) requires that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion." This can be done by citation to materials in the record, which include depositions, documents, affidavits, stipulations, and electronically stored information. Fed. R. Civ. P. 56(e)(1)(A). Rule 56(c)(1)(B) allows a party to "show[ ] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

After the moving party has carried its initial burden of showing that there are no genuine issues of material fact in dispute, the burden shifts to the non-moving party to present specific facts demonstrating that there is a genuine issue for trial. *Matsushita Elec. Indus. Co., v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "The 'mere possibility' of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (citing *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)).

In order to defeat the motion for summary judgment, the non-moving party must present probative evidence that supports its complaint. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986). The non-moving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor. *Id.* at 255. The court determines whether the evidence requires submission to a jury or whether one party must prevail as a matter of law because the issue is so one-sided. *Id.* at 251-52.

# ANALYSIS

### 1. Which Version of the Agreement is Controlling?

Section E.3, the Agreement's merger clause, provides that:

> This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof, and no amendment, alteration or modification of this Agreement, whether in written or verbal form, shall be valid unless . . . reviewed and approved in writing by the President of the owner of the Hospital and Hospital's in-house legal counsel.

Even without a merger clause, the last agreement as to a subject matter is supersedes all former agreements. *Bringhurst v. Tual*, 598 S.W.2d 620, 622 (Tenn. Ct. App. 1980). Under normal circumstances, therefore, there would be no question that the August Agreement was the final word on Dr. Mosley's recruitment. However, Dr. Mosley claims that he did not assent to the terms of the August Agreement because he was not aware of them. A contract will only be valid where there was mutual assent to its terms. *Moody Realty Co. v. Huestis*, 237 S.W.3d 666, 674 (Tenn. Ct. App. 2007). The determination of mutual assent is decided objectively, by the manifestations of the parties' intent in the agreement itself. An individual's signature on a contract is objective proof of his assent to its terms. *Robert J. Denley Co. v. Neal Smith Const. Co.*, No. W2006-00629-COA-R3CV, 2007 WL 1153121, at *6 (Tenn. Ct. App. Apr. 19, 2007).

This case is unique in that there are competing contracts and both parties take the apparent position that there was a meeting of the minds as to their preferred version of the Agreement because it transmitted the document to the other, even if the other failed to read it. They likewise argue that there was not a meeting of the minds as to whatever version of the Agreement is unfavorable to them because, although it may have been received, there was no

reason to believe that changes had been made to the previous draft[3]. Simply put, the Hospital and Dr. Mosley appear to agree that each party to a contract bears the burden of actually reading it, but they differ on whose failure to read the contract should be excused in this case.

"It is a bedrock principle of contract law that an individual who signs a contract is presumed to have read the contract and is bound by its contents." *84 Lumber Co. v. Smith*, 356 S.W.3d 380 (Tenn. 2011) (*citations omitted*). Tennessee courts have unequivocally held that, where a contract is clear and unambiguous, a party cannot hide behind his own failure to review its terms. Were courts willing to invalidate an arms-length contract merely because a party decided not to read it, any businessman would have a quick mechanism to escape unfavorable terms at their election, and indeed, no one would have any incentive to read one's agreements, as knowledge of an agreements contents would be a disadvantage under the law. In short, contracts would not be "worth the paper on which they are written." *84 Lumber*, 356 S.W.3d at 383 (quoting *Beasley v. Metro. Life Ins. Co.*, 229 S.W.2d 146, 148 (1950)). Tennessee law is clear on its policy of upholding contracts.

However, because this dispute arises from contract revisions, rather than original terms, there are two unique wrinkles in the facts. First, the Hospital takes the position that it did not receive any document with changes, and that the version of the July Agreement that Dr. Mosley returned did not contain the handwritten changes. (Aff. of Tennie McCord [doc. 152-1]). If true, then the July Agreement cannot be the operative contract. However, the revised July

---

[3] Dr. Mosley claims that he was "tricked" into signing the August contract because the Hospital did not tell him it made changes. Mosley apparently hasn't thought this argument through, however, since he fails to extend the logic to cover his own trickery in changing the terms in the July Agreement. The inverse is true as well. Since Dr. Mosley claims that the July Agreement became valid on the Hospital's receipt of it, the same logic should apply to the August Agreement, which he admittedly received from the Hospital, sans changes. As for the Hospital's position: there was a meeting of the minds in August because Dr. Mosley received the August Agreement, regardless of whether he actually read it. The Hospital contends that it never received Dr. Mosley's handwritten changes.

Agreement's origin and the question of whether the Hospital received it at all are disputed matters of fact, and are improper at this stage.

Second, the Hospital contends that, setting the July contract aside, the August Agreement must control because it is the later agreement and Dr. Mosley will be bound to its terms even if he did not read them. Dr. Mosley claims that he only intended to agree to the modification in Section D.3. (Mosley Depo. [doc. 140-1] at 248). He testified that he did not know if his handwritten terms were incorporated into the agreement he signed in August, because he did not check for them, but he considered them to be part of the final agreement. (Mosley Depo. [doc. 140-1] at p. 248, 260).

The Hospital points to a 2009 case, *Broadnax v. Quince Nursing and Rehabilitation Center*, wherein the Tennessee Court of Appeals addressed facts analogous to those in the present case. No. W2008-2130-COA-R3-CV2009 WL 2425959 (Tenn. Ct. App. August 10, 2009). There, the court considered whether to enforce a contract's fine print where the plaintiff admitted that she did not read it, but assumed the contract was identical to a prior agreement based on an oral representation that it contained "standard admissions forms." *Id.* Upon a later dispute, the plaintiff discovered that the agreement contained an arbitration clause. She argued that there had been no meeting of the minds because she had been unaware of the term, which was not contained it the earlier contract. The court rejected the plaintiff's argument that she should not be bound to the arbitration agreement, stating the rule in Tennessee:

> [i]f, without being a victim of fraud [the individual] fails to read the contract or otherwise to learn its contents, he signs the same at his peril and is estopped to deny his obligation, will be conclusively presumed to know the contents of the contract, and must suffer the consequences of his own negligence.

*Id.* at *9 (quoting *Giles v. Allstate Ins. Co. Inc.*, 871 S.W.2d 154, 156 (Tenn. Ct. App. 1993)).

Dr. Mosley does not dispute the law, but responds that his failure to read the contract was immaterial, because Ms. Rader's e-mail was an affirmative statement that the document had not changed. Dr. Mosley cites to the *Teague Brothers v Martin & Bayley* case, in which the state appellate court stated an exception to the rule in situations "when neglect to read is not due to carelessness alone, but was induced by some stratagem, trick, or artifice on part of one seeking enforcement of the contract." 750 S.W.2d 158 (Tenn. Ct. App. 1987). In that case, the defendant added a term releasing the parties from liability to a late draft of a lease modification agreement. 750 S.W.2d 152 (Tenn. Ct. App. 1987). The defendant did not inform the plaintiff of the change, and plaintiff did not notice it when he signed the agreement. The appellate court found the agreement invalid, ruling that the duty to read a contract before signing can be suspended where a party's negligence is induced by false representations as to its contents. However, that case was decided on facts that the contract had been "intentionally altered so that the contents were changed while the appearance of the document remained the same." *Id.* at 157. Where modifications are conspicuous, such as handwritten dates or terms, a party signing an agreement without reading it first does so at his own peril. *Moody,* 237 S.W.3d at 677.

Dr. Mosley has not presented any evidence that would rise to the level of the fraudulent inducement he alleges. The Hospital did not make any untrue statements as to the contents of the Agreement, and it did not "trick" him into signing a contract he had not read; Ms. Rader's e-mail merely directed his attention to the section of the Agreement that contained a new term. It did not assure Dr. Mosley that his changes—which he failed to bring to the Hospital's attention—were incorporated into the August Agreement, and there is nothing in the record to suggest that it had

any intent to act in bad faith. Unlike the plaintiff in *Teague Brothers*, who had no reason to be on notice regarding the challenged section, the additional/missing handwritten terms in the August Agreement were conspicuous. Dr. Mosley agrees that he received a new contract, rather than an amendment to a previous contract. (Mosley Depo. [doc. 140-1] at p. 250). He agrees that he did not check to see if his additional terms were there, and that he did not knew if they were. (Mosley Depo. [doc. 140-1] at p. 248-49).

Dr. Mosley is an educated man, well capable of understanding the terms of the Agreement. And he had the incentive to understand its terms—the Agreement entitled Dr. Mosley to, and obligated him to repay, more than one million dollars. He does not dispute that he received the August Agreement and that he had ample time to review it. Even if he only paged through the Agreement (which he did, as evidenced by his initials on each page), even a modicum of diligence would have revealed that changes he himself made only a few days before were not part of the contract. He must also have known that the Agreement contained a merger clause since he had read it a few days prior. Nonetheless, he signed his assent and returned it without question. The Court finds that there was mutual assent as to the August Agreement, that the August Agreement supersedes the July Agreement, and that it will be the controlling document for the resolution of this case. Dr. Mosley's Motion for Summary Judgment based on the July Agreement is therefore **DENIED**.

### 2. Did the Agreement Become Effective?

The parties next raise the issue of whether the Agreement became effective under the condition precedent contained in Section E.7:

> THIS AGREEMENT SHALL NOT BE EFFECTIVE . . . UNTIL IT HAS
> BEEN REVIEWED AND ELECTRONICALLY APPROVED BY [THE

HOSPITAL'S MANAGEMENT COMPANY AND COUNSEL]. THE EFFECTIVE DATE OF THIS AGREEMENT SHALL BE THE DATE THAT IT IS ELECTRONICALLY APPROVED [].

The Hospital argues that the July Agreement did not become valid because the changes were not approved. In fact, the Hospital never sent the Agreement through the approval channels because it was amended again within a few days. (Decl. of Sarah Smith [doc. 140-3]). Because the July contract is immaterial, the Court declines to rule on the argument.

However, Dr. Mosley also asks to enforce Section E.7. In his brief supporting his own motion for summary judgment [doc. 139], he points out that he sought verification of the Hospital management company's approval during discovery, and implies that the Agreement never became effective. Dr. Mosley offers no affirmative proof that the Agreement was not approved, and the Hospital submitted an affidavit of an employee of its management company, who stated that such approval occurred. (Decl. of Sarah Smith [doc. 140-3]). The Hospital also submitted internal e-mails and documents noting that the August Agreement had been approved. (Decl. of Sarah Smith, ex. C, D [doc. 140-3]). Dr. Mosley does not dispute the veracity of that proof. Moreover, even if the condition had failed, there is no dispute that the parties performed under the contract beginning in August 2011 and continuing through 2013. A party who performs under a contract waives any right to enforce failed conditions precedent, even where the contract states that it "will be null and void if the condition is not met." *Tennessee Div. of United Daughters of the Confederacy v. Vanderbilt Univ.*, 174 S.W.3d 98, 115 (Tenn. Ct. App. 2005) (citations omitted). Section E.7 does not preclude the Agreement's enforcement.

### 3. Did Dr. Mosley Breach the Agreement?

Having determined that the August Agreement is the controlling document in this case, we now turn to the issue of whether Dr. Mosley breached its terms.

Paragraph B.4 of the Agreement provides, in relevant part:

> Physician shall discharge obligations hereunder on a regular and continuous basis. . . . If Physician fails to render services pursuant to this Agreement for a period of ten (10) consecutive business days during the Cash Collections Guarantee Period without Hospital and Physician's mutual agreement, Physician shall have failed to carry out Physicians covenants on a regular and continuous basis.

The parties agree that Dr. Mosley began practice on or around August 15, 2011. The Guarantee Period expired eighteen months later, on or about February 15, 2013. The Hospital claims that Dr. Mosley breached the Agreement by missing more than ten consecutive days of work in November and December of 2012. There is no dispute that Dr. Mosley left the country on November 14, 2012. (Def. Response to Pl. Statement of Facts [doc. 148] at ¶ 19). His office manager testified that he did not return to the practice until at least December 17, 2012. (Dortch Depo. [doc. 140-2] at p. 55). Assuming that Thanksgiving was the only holiday during this period, Dr. Mosley was absent for 24 business days[4].

However, Dr. Mosley argues that he was not absent because he visited the office in early December of 2012. He admits that he did not personally treat any patients, but claims he "rendered services" through his medical assistant, who was there removing sutures and changing bandages during his visit. (Mosley Depo. [doc. 140-1] at p. 78-80). He also claims that his office assistant performed administrative tasks (*id.*) and that he had another physician cover his call services while he was away. (Mosley Affidavit [doc. 151-2] at ¶ 4). He does not, however, identify what services the covering physician performed and admits that he postponed surgeries that had previously been scheduled during that period.

---

[4] The absence appears to run afoul even of Dr. Mosley's handwritten terms in the July Agreement, which provided that more than twenty consecutive business days constituted a breach of contact.

Dr. Mosley's argument is unpersuasive. The clear intent of the Agreement was for Dr. Mosley to work as full-time orthopedic surgeon in the Clinic. Indeed, it is the entire purpose of the relationship between the parties; the Agreement's language identified Dr. Mosley as the "Physician" and provided that the "Physician [shall] render services." The term is unambiguous and contemplated that the services rendered would be the medical services of Dr. Mosley alone. Providing an office worker to schedule appointments and answer the telephone cannot constitute "rendering [medical] services" by any standard. The services his assistant performed (changing bandages and removing sutures), while important, were minor and do not equal the full services of a medical doctor. Dr. Mosley points to no portion of the Agreement that could be interpreted to allow a medical assistant's services to substitute for his own. Where a contract is for services and involves confidence in a party's skills, its rights and obligations are not assignable. *Fleet Bus. Credit, LLC v. Grindstaff, Inc.,* No. W200701341COAR3CV, 2008 WL 2579231, at *5 (Tenn. Ct. App. June 30, 2008). The Agreement does provide that Dr. Mosley could have sought the Hospital's consent to be absent for longer than ten days, but there is no evidence that Dr. Mosley sought such consent. There is no question that Dr. Mosley missed more than ten consecutive business days of practice in November and December. He therefore breached Section B.4 of the Agreement.

### 4. Dr. Mosley's Defenses

The final issues to resolve concern Dr. Mosley's defenses. The Hospital filed this Action on December 17, 2013. [doc. 1]. In his initial pleadings, Dr. Mosley made several counter-claims. [docs. 22, 31]. On the Hospital's motion, the Court dismissed Dr. Mosley's claims for breach of contract, intentional interference with a business relationship, and unjust enrichment for failure to state a claim in 2014. [doc. 42]. Dr. Mosley later voluntarily dismissed his

remaining claims for negligent misrepresentation and fraud in the inducement. [doc. 159]. Despite having dismissed his claims, Dr. Mosley argues that his allegations as to fraud and misrepresentation remain relevant for the purposes of his affirmative defenses. Courts will not enforce a contract against a party that was fraudulently induced. *Shelby Electric Company, Inc. v. Forbes*, 205 S.W. 3d 448, at 453 (Tenn. App. 2005).

The Hospital moves to bar Dr. Mosley from arguing the allegations at trial under the doctrine of collateral estoppel. The Hospital also challenges the merits of the defenses.

**(a) Collateral Estoppel**

Dr. Mosley argues that the Hospital misrepresented its past profits during the negotiations and that he was therefore fraudulently induced to enter the Agreement. Specifically, on two separate occasions, Mr. Buckner and Ms. Rader provided Dr. Mosley with a chart purporting to disclose the collections of Dr. Elizondo, an orthopedic surgeon who practiced at the clinic in 2010. Dr. Mosley claims that the figures reflected positive collections during Dr. Elizondo's first six months of practice at the clinic and that he relied on the information in agreeing to move his practice to Shelbyville. He later learned that the figures were inflated and that Dr. Elizondo's practice had, in fact, operated at a loss. (Amended Answer [doc. 21 at ¶ 36, 39] incorporating Amended Counter-Claim [doc. 31 at ¶¶ 34-41]). Dr. Mosley also claims that the Hospital induced his assent by misrepresenting the access he would have to x-ray imaging equipment and facilities. (Amended Counter-Claim [doc. 31] at ¶ 41).

This is not the first time Dr. Mosley has brought his fraud claims before a court of law. Prior to the commencement of this case, the Clinic sued Dr. Mosley in the Tennessee Circuit Court for Bedford County. The Clinic brought claims against Dr. Mosley for breaching his leases

on the office space and equipment. That suit arose from Dr. Mosley's refusal to pay rent for the first half of August 2011, for October 2011, when he was sharing space with another physician, and for other periods in 2013.

In the state court case, Dr. Mosley made similar allegations of fraudulent inducement and misrepresentation, both as counter-claims and affirmative defenses. The language of Dr. Mosley's pleaded counter-claims in the state court action and in this action are nearly identical, with the primary difference being that Dr. Mosley replaced "Shelbyville Clinic Corp." in the former with "Heritage Medical Center" in the latter. (compare Defendant's Amended Counter-Complaint [doc. 31] at ¶¶ 34, 41 with Bedford County Second Amended Counter-Complaint at ¶¶ 36, 41).

The state court action was tried before the Bedford County Circuit Court from October 2015. Dr. Mosley did not put on any proof to support his fraud and misrepresentation claims. (see Def. Response to Pl's Motion for Summary Judgment [doc. 149] at p. 6 n.3). The trial court entered a directed verdict in the Clinic's favor, finding that there was no evidence of fraudulent inducement. However, the state court has not yet entered a final judgment on the case.

The doctrine of collateral estoppel precludes issues from relitigation after a determination on the merits. "[W]hen an issue has been actually and necessarily determined in a former action between the parties, that determination is conclusive upon them in subsequent litigation." *Stacks v. Saunders*, 812 S.W.2d 587 (Tenn. Ct. App. 1990). Where federal jurisdiction is based on diversity of citizenship, the Court must apply collateral estoppel according to the law in the state where the case arises. Federal courts must give state court judgments the same preclusive effect they would receive under the laws of the rendering state. 28 U.S.C. § 1738; *Ingram v. City of*

*Columbus,* 185 F.3d 579, 593 (6th Cir. 1999). In other words, "'[i]f an individual is precluded

from litigating a suit in state court by the traditional principles of res judicata, he is similarly

precluded from litigating the suit in federal court.'" *ABS Indus., Inc. ex rel. ABS Litig. Trust v.*

*Fifth Third Bank,* 333 F. App'x 994, 998 (6th Cir. 2009) (quoting *Gutierrez v. Lynch,* 826 F.2d

1534, 1537 (6th Cir.1987)).

> In Tennessee, a party seeking to establish collateral estoppel must show:
>
> (1) That the issue sought to be precluded is identical to the issue decided in the earlier suit; (2) that the issue sought to be precluded was actually litigated and decided on its merits in the earlier suit; (3) that the judgment in the earlier suit has become final; (4) that the party against whom collateral estoppel is asserted was a party or is in privity with a party to the earlier suit and (5) that the party against whom collateral estoppel is asserted had a full and fair opportunity in the earlier suit to litigate the issue now sought to be precluded.

*Patton v. Estate of Upchurch*, 242 S.W.3d 781 (Tenn. Ct. App. 2007). However, the doctrine

only applies in so far as the controlling facts of both cases are the same. See *Lien v. Couch*, 993

S.W.2d 53, 56 (Tenn. Ct. App. 1998) (stating that courts may reexamine a previously-decided

issue where relevant facts have changed).

In this case, Dr. Mosley argues that the state court case cannot preclude his defenses in

this case because (1) he did not have the opportunity to fully litigate the fraud and

misrepresentation claims as they were irrelevant to the lease agreement dispute, and (2) the state

court judgment has not become final. Unfortunately, the Court does not have sufficient

information to determine what opportunities Dr. Mosley had or did not have because the parties

have submitted scant record of the state court trial. The parties did not submit evidence to show

how the lease agreement was negotiated, nor how the recruitment agreement related to the

critical facts of the state court case, whatever they may have been. The only documents before

the Court are Dr. Mosley's initial pleadings and two pages of trial transcript, unaccompanied by

any context. It is clear from those documents that Dr. Mosley did make the fraud allegations and that the state court entered a directed verdict, stating "there's essentially no proof of fraudulent inducement of the contract." (Trial Transcript at p. 44 [doc 143-3]). Dr. Mosley explains that he did not put on proof to support the fraud allegations because it was irrelevant to the lease agreement. His counsel in the prior case submitted an affidavit stating that the evidence was limited by objections. (Harvey. Aff. [doc. 151-6] at ¶¶ 4-5).

The Hospital contends that the state court's fraud ruling is binding here because there is no distinction between the fraud "as it related to" the lease and the recruitment agreement—Mosley pleaded that the same fraud committed by the same individuals induced him to signing both contracts. This may be true, but the agreements are not one and the same. The state court did not find that "no one defrauded Mosley and no one induced him to sign anything" (Pl. Reply in Support of Summary Judgment [doc. 157] at p. 12), it found that no one induced him to sign the <u>lease agreement</u>. That determination alone is not patently conclusive on the issue of whether Dr. Mosley was induced into entering the recruitment agreement. Without more evidence to show that the state court considered facts relevant to both documents, this is merely a legal judgment as to that specific agreement, not a global factual finding.

Moreover, the Hospital admits that the state court has not entered a final judgment on the trial. ("Mosley is correct that the judgment in state court is not yet final." (Pl. Reply in Support of Summary Judgment [doc. 157] at p. 11)). Without a final judgment, the Hospital cannot establish the elements of collateral estoppel. The Hospital's Motion is therefore **DENIED** as it relates to the state court judgment.

The Hospital has a second theory of collateral estoppel. On January 14, 2016, this Court entered an Order granting Dr. Mosley's motion to voluntarily dismiss his counterclaims for fraud and misrepresentation. [doc. 159]. The Hospital claims that Dr. Mosley's voluntary dismissal bars him from bringing the allegations as defenses. In a supplemental brief [doc. 164], the Hospital relies on a Second Circuit case, *Saud v. Bank of New York*, as "dispositive" support of its argument that dismissal of a fraud claim precludes a fraud defense. 929 F.2d 916, 917 (2d Cir. 1991). In *Saud*, a bank obtained a default judgment against a guarantor on a defaulted loan after the guarantor failed to respond to the bank's motion for summary judgment. The guarantor then brought a separate RICO action against the bank, claiming that the bank's illegal lending practices had induced him to act as a guarantor on the loan. The Second Circuit looked to the plaintiff's pleadings in the earlier guaranty suit, in which he made similar allegations as affirmative defenses. The court stated that "the presence of the facts essential to Saud's RICO claims [was] amply demonstrated by Saud's submissions in the Guaranty Action." *Id.* at 919. The court determined that res judicata precluded the plaintiff's suit because he could have raised the RICO claim in the prior case.

This Court fails to see the parallel between the present case and *Saud*. *Saud* involved two separate lawsuits, wherein the plaintiff was barred from litigating a claim in the second that he neglected in the first. The plaintiff's actions did not preclude an affirmative defense in the same case; they precluded a claim in a subsequent case. That is entirely different from the posture of this action, and the Hospital presents no case in which a dismissed counterclaim bars a defense involving common facts in the same action. Further, as discussed above, it is not clear what facts were considered in the state court litigation.

The logical extension of the Hospital's argument—that any plaintiff who dismisses a claim thereby forfeits facts in his own defense—would force claimants to pursue claims and damages even where they are unwarranted. This would be a powerful weapon for savvy lawyers, and one in direct conflict with the foundational rule that a plaintiff is the master of his claim. The Court is not willing to exercise such control over a litigant's claims, nor give that control to his opponent. Collateral estoppel imposes limits on a claimant's ability to re-assert certain claims, it does not preclude him from defending himself in the same action.

Finally, the Hospital's argument that a voluntary dismissal of claims operates as a final judgment on the merits because it cannot be appealed is unpersuasive. There is no Tennessee law requiring that a final judgment for the purposes of an appeal will always be a final judgment for purposes of collateral estoppel. Rule 54.02 of The Tennessee Rules of Civil Procedure provides:

> When more than one claim for relief is present in an action, whether as a claim, counterclaim, cross-claim, or third party claim, or when multiple parties are involved, the court, whether at law or in equity, may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties . . . In the absence of such determination and direction, any order or other form of decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of the judgment adjudicating all the claims and the rights and liabilities of all the parties.[5]

Tennessee courts are also clear that a judgment is final only "when it decides and disposes of the whole merits of the case leaving nothing further for the judgment of the court." *Richardson v. Tennessee Bd. of Dentistry*, 913 S.W.2d 446, 460 (Tenn. 1995). In this instance, the Plaintiff's claims remain pending and the order dismissing Dr. Mosley's claims [doc. 157] expressly provides it did not determine the merits of his affirmative defenses. There has been no final judgment in this case, and collateral estoppel does not apply.

---

[5] Tennessee's rule on judgments differs from the Fed. R. Civ. Pro. 54(b) only in its choice of words. The effect is identical.

**(b) Dr. Mosley's "New" Theory Of Fraud**

The Hospital then argues that Dr. Mosley failed to disclose his defense that the Hospital defrauded him. It claims that Dr. Mosley's assertion that the Hospital concealed the fact that Dr. Elizondo was losing money is a brand new allegation and should be barred. (Pl. Reply [doc. 157] at p. 1]. The argument is rejected. Dr. Mosley's Second Amended Counter-Claim asserted that the Plaintiff provided him with "inaccurate, inflated, and/or false" statements regarding Dr. Elizondo's income and that he relied on those statements as proof of his anticipated income. [doc. 31 at ¶¶ 34-36]. The fact that Dr. Mosley did not state the exact amount by which the statements were inflated is immaterial.

**(c) The Merits of Dr. Mosley's Defenses**

The Hospital next challenges the merits of Dr. Mosley's affirmative defenses on their own feet. A party seeking to prove fraudulent inducement must show that the defendant:

> (1) made a false statement concerning a fact material to the transaction (2) with knowledge of the statement's falsity or utter disregard for its truth (3) with the intent of inducing reliance on the statement, (4) the statement was reasonably relied upon, and (5) an injury resulted from this reliance.

*Baugh v. Novak*, 340 S.W.3d 372, 388 (Tenn. 2011) (citing *Lamb v. MegaFlight, Inc.,* 26 S.W.3d 627, 630–31 (Tenn.Ct.App.2000)); *Ingram v. Cendant Mobility Fin. Corp.,* 215 S.W.3d 367, 371 (Tenn. Ct. App. 2006). The elements of negligent misrepresentation are similar, with the critical difference that fraud requires the representation to be made knowingly. To prove negligent misrepresentation, a party must show that:

> (1) the defendant is acting in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary (as opposed to gratuitous) interest; and

> (2) the defendant supplies faulty information *meant to guide others in their business transactions;* and
> (3) the defendant fails to exercise reasonable care in obtaining or communicating the information; and
> (4) the plaintiff justifiably relies upon the information.

*Robinson v. Omer*, 952 S.W.2d 423, 427 (Tenn. 1997). Additionally, the false information must 'consist of a statement of a material past or present fact.'" *McElroy v. Boise Cascade Corp.*, 632 S.W.2d 127, 130 (Tenn. Ct. App. 1982) (citations omitted). Thus, "statements of opinion or intention are not actionable," and "representations concerning future events are not actionable even though they may later prove to be false." *Id.; see also Freightliner of Knoxville, Inc. v. DaimlerChrysler Vans, LLC*, 438 F. Supp. 2d 869 (2006) (finding that an actionable misrepresentation must consist of a material past or present fact and cannot be based on opinion or conjecture as to future events). Concealment of material facts can be a form of fraud or misrepresentation. *Homestead Grp., LLC v. Bank of Tennessee*, 307 S.W.3d 746, 751 (Tenn. Ct. App. 2009).

During the negotiations, Dan Buckner represented to Dr. Mosley that the Clinic's estimated operating expenses for 2011 would be $234,000 excluding a nurse practitioner's salary, or $355,344 including one. [doc. 138-1]. Mr. Buckner also provided him with a chart, representing that it reflected Dr. Elizondo's collections during his first six months of practice in January – July 2010. The Hospital does not deny providing the chart, but notes that it was for Dr. Elizondo's last six months of practice. The parties submitted the chart as evidence. [doc. 143-4]. It consists of a simple bar graph and three-column chart stating Dr. Elizondo's "Actual Collections" from January to June 2010, which totaled $275,126. The chart next listed the "Projected Collections" for July through June 2012, assuming the practice continued to grow at a rate of 7.44% per month. The total for the actual and projected collections is $411,419.

On June 2, 2011, Tisha Rader provided Dr. Mosley the same chart in an attachment to an e-mail. (Rader e-mail 06/02/2011 and attachment [doc. 143-4]). Ms. Rader's e-mail reads, "Attached are Dr. Elizondo's collections you requested. Please let me know if you have any questions." (*Id.*) The attachment also contained a second page, a billing spreadsheet, purportedly supporting the figures on the chart. [see doc. 43-4]. Without instruction on how to interpret the spreadsheet, it is difficult to determine how the figures were calculated, but it is clear that the numbers do not match up exactly. For example, the chart lists Dr. Elizondo's Actual Collections for January 2010 as $36,980, but this figure does not appear anywhere on the spreadsheet; the same is true for all of the figures listed. As it turns out, the figures on the chart represented the collections of Dr. Elizondo <u>and</u> a nurse practitioner, Mr. Enroth. (Mosley Depo. [doc. 143-1] at p. 390). There is no indication of Mr. Enroth in the chart itself, but his collections are reflected separately in the spreadsheet. Dr. Mosley does not dispute the accuracy of the chart and spreadsheet, but contends he did not understand that the chart included Mr. Enroth's collections. He asserts that he relied on the figures in his decision to enter the Agreement because he believed that they were representative of his future earning potential as an orthopedic surgeon in Shelbyville. The Hospital claims that Dr. Mosley cannot establish fraud and/or misrepresentation because the information reporting Dr. Elizondo's collections did not concern an existing fact.

The Hospital is correct in arguing that Dr. Mosley cannot claim he relied on the Hospital's projections of his future earnings because they are not statements of fact. However, the Hospital's representations of past collections—Dr. Elizondo's collections from January to July 2010 and his growth rate during that period—were representations of past facts. Dr. Mosley alleges the chart and estimated operating costs led him to believe that the Clinic was profitable, when it was actually operating at a loss. In other words, the falsity was not merely the figures on

the chart, nor the statement of the Clinic's operating costs, but the logical conclusion to be drawn from the pair—that the Clinic was profitable. Dr. Mosley claims he relied on <u>that</u> representation, which proved to be false, in concluding that his own practice would be profitable. This is permissible. It does not, however, determine the truth of the Hospital's statements. If Dr. Mosley relied on accurate figures to predict his future earnings, the statements would not be actionable if his predictions failed to materialize. There is a question of fact as to whether the statements were accurate, e.g., whether Mr. Buckner falsely represented to Dr. Mosley that the collections were Dr. Elizondo's alone.

However, even assuming a misrepresentation was made, Dr. Mosley must still prove that he reasonably relied on it in entering the contract. In determining whether a party reasonably relied on a statement, the court will look to "[the party's] business expertise and sophistication, the availability of the relevant information, and the opportunity to discovery the fraud." *Allied Sound, Inc. v. Neely*, 58 S.W.3d 119, 122 (Tenn. Ct. App. 2001) (internal quotations omitted). Generally, a party dealing on equal terms with another is not justified in relying upon representations where he has the means of knowledge within his reach. *Soloman v. First American Nat'l Bank of Nashville*, 774 S.W.2d 935, 943 (Tenn. Ct. App. 1989). Tennessee courts place the burden of investigation on the party claiming fraud, stating that:

> "[Where a party to a contract] has the opportunity by investigation or inspection to discover the truth with respect to matters concealed or misrepresented, without prevention or hindrance by the other party, of which opportunity he is or should be aware, and where he nevertheless fails to exercise that opportunity and to discover the truth, he cannot thereafter assail the validity of the contract for fraud, misrepresentation or concealment with respect to matters which should have been ascertained, particularly where the sources of information are furnished. . . .

*Goodall v. Akers*, No. M200801608COAR3CV, 2009 WL 528784, at *7 (Tenn. Ct. App. Mar. 3, 2009) (citations omitted); *See also Allied Sound*, 58 S.W.3d at 122 (finding that plaintiff with notice of conditions on lease should have inquired as to their content). In *McNeil v. Nofal*, the Tennessee Court of Appeals considered a contract to sell a retail market and its inventory. 185 S.W.3d 402, 409 (Tenn. Ct. App. 2005). Prior to the sale, the seller disclosed some sales information. Although it was not the most recent information, the seller felt that it was a fair representation of the store's sales potential. After the purchase, the buyer discovered that the market's sales were in fact lower than the figures the seller had provided. The trial court determined that the seller had not been clear that the figures were outdated and had negligently misrepresented the market's viability. However, the appellate court determined that the buyer had not reasonably relied on the information because he had not exercised his contractual right to request sales verification. The court also noted that the buyer had experience in similar transactions and had independently investigated the market. *Id.* at 409.

There is a dispute as to whether Dr. Elizondo's practice was too dissimilar from Dr. Mosley's to be comparable for the purposes of reasonable reliance. The Hospital argues that Dr. Mosley could not have relied on the spreadsheet to predict his own collections because the spreadsheet represented Dr. Elizondo's last six months in an established practice, whereas Dr. Mosley would be starting a practice from scratch. Dr. Mosley testified that he would not expect a new practice to generate the same profits as an established one and that there would be some "ramp up." (Mosley Depo. [doc. 143-1] at p. 403). However, Dr. Mosley testified that Mr. Buckner told him the figures on the chart represented Dr. Elizondo's first six months of practice. (Mosley Depo. [doc. 151-2] at p. 384). Nonetheless, he knew that Dr. Elizondo had entered into an established practice, whereas he would be beginning a new practice. He testified that

comparing collections of an established practice to collections of a brand new practice would be "talking about apples and oranges." (*Id.*)

The labored focus on whether the chart represented Dr. Elizondo's first or last six months of practice and whether those months would be comparable to Dr. Mosley's practice is somewhat puzzling. Dr. Mosley has not claimed that he entered the Agreement based solely on what he expected to earn in the first six months. A party contracting for a three-year term of employment would consider three years of potential earnings, not only his earnings over the first six months. It is not unreasonable that Dr. Mosley would use the collections of an established practice in the area to calculate his own anticipated collections after the "ramp up" period. In fact, the Agreement's "Cash Collections" scheme contemplated this scenario—it was expected that Dr. Mosley's collections would increase as his practice became established. Therefore, although Mosley's and Elizondo's practices would be initially dissimilar, it was reasonable to believe that the gap would close over time. Dr. Mosley's testimony is not inconsistent with reliance.

However, while reliance on this type of information is not unreasonable, reliance on this specific information was unreasonable under the circumstances. The facts of this case are analogous to the *McNeil* case. As noted, Dr. Mosley is an educated man with experience in his field. This was not Dr. Mosley's first contract to practice medicine. (Mosley Depo. [doc. 143-1] at p. 313). It was not a small contract, nor was it entered in a hurry—the course of the negotiations shows that Dr. Mosley was given plenty of time to consider the deal and that he was capable of intelligent review.

Further, Dr. Mosley does not dispute that he received the e-mail from Ms. Rader that contained the chart and spreadsheet[6]. Had Dr. Mosley exercised any diligence in reviewing the spreadsheet, he would have easily discovered that the figures did not square or at least have reason to question the underlying information. Despite Ms. Rader's invitation for questions, he did not attempt to clarify the chart. He did not ask for additional information. Although Dr. Elizondo's collections were only reported through July 2010 and Dr. Mosley received the chart in June 2011, he did not ask for more recent information or inquire as to why the collections stopped in July[7]. (Mosley Depo. [doc. 143-1] at p. 385-86). Parties to a contract have a duty to educate themselves on the information that is available to them and cannot claim to blindly rely on unsupported representations. *McNeil*, 185 S.W.3d at 409-10. Dr. Mosley had information that contradicted his understanding of the chart and he had full opportunity to request clarification. His failure to exercise that opportunity was a failure to meet his duty of due diligence under Tennessee law. Simply stated, Dr. Mosley cannot avoid his contractual responsibilities by claiming ignorance when he had every opportunity to protect himself.

He also could have asked for additional information on Dr. Slusher, another physician at the Clinic, whose numbers were also listed on the spreadsheet. He testified that Mr. Buckner told him Dr. Elizondo's collections would be the most comparable, but further testified that he personally considered Dr. Slusher "to be the most relevant person to me." (Mosley Depo. [doc. 143-1] at p. 378). Dr. Mosley claims that the Hospital concealed Dr. Slusher's records from him, but he met personally with Dr. Slusher and had the opportunity to ask him about his collections

---

[6] Dr. Mosley admits that he received the e-mail from Ms. Rader (Mosley Depo. [doc. 151-2] at p. 376), but claims that he did not see the spreadsheet (Mosley Depo. [doc. 151-2] at p. 389).

[7] (Mosley Depo. [doc. 151-2] at p. 385). There was reason to question whether the figures were for Dr. Elizondo's first six months of practice, since the figures listed for July – December 2010 were "projected," but should have been actualized by the time Dr. Mosley received the information in June 2011. At the least, this should have led Dr. Mosley to realize that there was missing information and/or that the figures were not as he believed.

and did not do so. Dr. Mosley had the means to "obtain the information needed and discover any fraud if he had simply asked[.]"*Allied Sound*, 58 S.W.3d at 122. Dr. Mosley is responsible for his own negligent failure to investigate.

Dr. Mosley must also show that Dr. Elizondo's reported collections induced him to make a decision that he would not have otherwise made. Misrepresentations must be "material so as to determine the conduct of the parties seeking relief." *Jackson v. Travelers Ins. Co. of Hartford, Conn.*, 403 F. Supp. 986, 996 (M.D. Tenn. 1975) *aff'd and modified sub nom. Edwards v. Travelers Ins. of Hartford, Conn.*, 563 F.2d 105 (6th Cir. 1977). Dr. Mosley testified that he relied on several sources of information in estimating his future collections. He undertook independent research on his projected earnings. He called other physicians in the area and researched what services were available in Tennessee. (Mosley Depo. [doc. 143-1] at p. 378-79). From his investigation, he felt that $75,000 in monthly revenue was a reasonable expectation. (*Id.* at p. 378-79). He thus felt that Mr. Buckner's estimates (based on Elizondo's collections) were inaccurate and reached his own conclusion as to what he would likely earn. (*Id.* at p. 379-80). Moreover, Dr. Mosley could not testify that he would not have entered into the Agreement if he had known that the chart included Mr. Enroth's collections. (*Id.* at p. 408). Dr. Mosley's alleged reliance on the representations of Dr. Elizondo's collections was unreasonable.

Finally, the Hospital argues that Dr. Mosley cannot establish fraud and/or misrepresentation regarding the availability of imaging services because the statements were not untrue when made. In his initial pleadings, Dr. Mosley asserted that:

- The Hospital represented that x-ray imaging services and facilities would be available for his use. [doc. 31 at ¶ 5].

- Dr. Mosley relied on the availability of the services in deciding to move his practice to Shelbyville. (*Id.* at ¶ 41).


- Following a rental dispute between the Clinic and Dr. Mosley, Dr. Mosley's favorable position on opening a new orthopedic surgical suite, which the Clinic opposed, and Dr. Mosley's statement to the Department of Labor regarding a dispute between the Clinic and another physician, the Clinic closed the imaging facilities in February 2013. [doc. 31 at ¶ 14, 20]. Dr. Mosley asserted that the action was taken in retaliation. (*Id.*)

Where an alleged fraud is based on a failed promise, Tennessee recognizes the claim of promissory fraud. Rather than showing that the defendant made a false statement of existing fact, a party seeking to prove promissory fraud must show that the defendant made a promise of future conduct with the present intention not to follow through. *Fowler v. Happy Goodman Family*, 575 S.W.2d 496, 499 (Tenn. 1978). However, a mere failure to comply with a promise will not support promissory fraud. Claimants must show the defendant's lack of intent "by evidence other than subsequent failure to keep the promise or a subjective surmise or impression of the promisee." *Stacks v. Saunders* , 812 SW.2d 587 (Tenn. App. 1990) (quoting *Farmers & Merchants Bank v. Petty*, 664 S.W.2d 77, 81 (Tenn. Ct. App. 1983).

Dr. Mosley does not offer any proof that the Hospital lacked the intent to provide x-ray imaging services when it executed the Recruitment Agreement. By Dr. Mosley's own pleadings, the Hospital intended to keep its promise until decided to retaliate against Dr. Mosley in February 2013, roughly eighteen months after Dr. Mosley moved his practice to Shelbyville. Dr. Mosley also testified that he did not believe the Hospital intended to make a false promise in 2011:

> Q: So, in 2011, before you signed any contracts, when Buckner said there will be x-ray services, do you think he meant what he said?

A: Absolutely.

Q: No reason to think that he was lying to you at that time?

A: No.

Q: [] Do you have any reason to think he was lying to you at the time?

A: I thought Dan Buckner was telling me the truth when he said x-ray services were there, were going to be there.

Q: Now, in hindsight, do you think Dan Buckner was lying to you?

A: No. I think Dan Buckner was still telling the truth, because like I said, every time I needed x-ray services there, they were provided up until March the 1st, 2013.

(Mosley Depo. [doc. 143-1] at p. 259-60). Dr. Mosley has not made a prima facie showing of promissory fraud based on the Hospital's failure to provide x-ray imaging services.

## CONCLUSION

Based on the foregoing, the Court finds:

(1) there was a meeting of the minds as to the August 5, 2011 Recruitment Agreement;

(2) Dr. Mosley breached the Agreement when he missed more than ten consecutive days of work in late 2012;

(3) Dr. Mosley's affirmative defenses of fraud and misrepresentation fail on their merits.

Accordingly, the Defendant's Motion for Summary Judgment [doc. 137] is **DENIED**; the Hospital's Motion for Summary Judgment on its Breach of Contract Claim [doc. 140] is **GRANTED**, except as to damages; the Hospital's Motion for Summary Judgment Dismissing Plaintiff's Defenses for Fraud and Misrepresentation is hereby **GRANTED** [doc. 143].

The Plaintiff will submit proof of its damages no later than April 8, 2016. Defendant shall respond with any objections no later than May 23, 2016. A hearing on damages will be scheduled thereafter.

To the extent that Plaintiff seeks recovery of attorneys' fees, it shall submit a separate motion in accordance with Rule 54 of the Federal Rules of Civil Procedure.

**IT IS SO ORDERED.**

Enter:

s/ Thomas W. Phillips
UNITED STATES DISTRICT JUDGE