UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

SHELBYVILLE HOSPITAL           )
CORPORATION, d/b/a HERITAGE    )
MEDICAL CENTER,                )
                               )
            Plaintiff,         )
                               )
v.                             )        No. 4:13-CV-88
                               )
E. WAYNE MOSLEY, M.D.,         )
                               )
            Defendant.         )

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's Motion for Compensatory Damages and Interest [doc. 178], Defendant's Response in Opposition [doc. 180], Plaintiff's Reply [doc. 184], Plaintiff's Motion for Attorney's Fees and Costs [doc. 179], Defendant's Response in Opposition [doc. 181], Plaintiff's Reply [doc. 185], Plaintiff's Proposed Findings of Fact and Conclusions of Law [doc. 231], and Defendant's Proposed Findings of Fact and Conclusions of Law [doc. 232]. For the reasons herein, the Court will deny the motions and schedule this case for a trial on damages.

## I.    BACKGROUND

In August 2011, Shelbyville Hospital Corporation and E. Wayne Mosley, M.D. ("Dr. Mosley") entered into a Recruitment Agreement [doc. 1-1], under which Dr. Mosley, with financial incentives from Shelbyville Hospital, agreed to establish a medical practice in Shelbyville, Tennessee, for thirty-six months. [*Id.* at 1–2]. The parties

agreed that this thirty-six-month period would proceed in two phases: (1) the Cash Collections Guarantee Period, which would comprise the first eighteen-months of the Recruitment Agreement,[1] and (2) the Cash Collections Continuation Period, which would comprise the second eighteen months of the Recruitment Agreement.[2] [*Id.* at 1, 3, 12]. During the first eighteen months—the Cash Collections Guarantee Period—Shelbyville Hospital guaranteed Dr. Mosley's practice would earn at least $84,416.66 every month. [*Id.* at 1, 10]. If Dr. Mosley's practice failed to realize $84,416.66 in any month, Shelbyville Hospital would make up the difference by providing Dr. Mosley with "Guarantee Payment[s]," but those payments could not exceed $1,013,000 in the aggregate. [*Id.*].

During the second eighteen months—the Cash Collections Continuation Period— Shelbyville Hospital would forgive one eighteenth of the total Guarantee Payments for each month that Dr. Mosley maintained the "Full-Time Private Practice of Medicine." [*Id.* ¶ D.7]. The parties agreed to these terms of forgiveness in paragraph D.7:

> During the Cash Collections Continuation Period, which shall begin on the day following the last day of the Cash Collections Guarantee Period and continue for the number of months set forth as the Continuation Period on the Cover Page, Hospital agrees that it will cancel (amortize) one eighteenth (1/18th) of the Total Cash Collection Guarantee Payments made by Hospital under this Agreement for each full month Physician remains in the Full-Time Private Practice of Medicine, in Physician's Specialty, in the Community. In the event Physician fails to maintain a Full-Time Private Practice of Medicine in the Community during the Cash Collections

---

[1] The Cash Collections Guarantee Period was to "begin on the Practice Commencement Date," [Recruitment Agreement at 3], which was August 15, 2011, [Mem. Op., doc. 173, at 4].

[2] The Cash Collections Continuation Period was to "begin on the day following the last day of the Cash Collections Guarantee Period," [Recruitment Agreement at 12], which was on or about February 15, 2013, [Mem. Op. at 13].

Continuation Period, Physician shall immediately reimburse to Hospital the unamortized amount of the Total Cash Collections Guarantee Payments paid hereunder.

[*Id.*]. Paragraph B.1 of the Recruitment Agreement defines "Full-Time Private Practice of Medicine" as a "minimum average of forty (40) hours per week of direct patient contact hours and patient care activities directly relating to the establishment of the practice of Physician's Specialty in the Community."

The Recruitment Agreement also binds Dr. Mosley to various "Covenants of Physician," [*id.* ¶¶ B.1–B.18], one of which is the requirement that Dr. Mosley, under paragraph B.1, must maintain the Full-Time Private Practice of Medicine during the full thirty-six-month duration of the Recruitment Agreement: "Physician shall . . . during the Practice Commitment Period, engage in the 'Full-Time Private Practice of Medicine' (as defined herein) in the Community." [*Id.* ¶ B.1].[3] In addition, paragraph B.4 requires Dr. Mosley to fulfill his contractual obligations "on a regular and continuous basis" during the first eighteen months specifically:

Physician shall discharge obligations hereunder on a regular and continuous basis. . . . If Physician fails to render services pursuant to this Agreement for a period of ten (10) consecutive business days during the Cash Collections Guarantee Period without Hospital and Physician's mutual agreement, Physician shall have failed to carry out Physician's covenants herein on a regular and continuous basis.

[*Id.* ¶ B.4]. The parties also contemplate consequences for Dr. Mosley's failure to fulfill his contractual obligations. Under paragraph D.6, they agreed that Dr. Mosley would be

---

[3] Some of the other Covenants of Physician include the appropriate care and supervision of patients, participation in education programs, performance of administrative duties, adherence to policies, reasonable care for the indigent, and provision of services to Medicare and Medicaid beneficiaries. [Recruitment Agreement ¶ B.7].

liable for damages if he failed to maintain the Full-Time Private Practice of Medicine during the first eighteen months:

> Should the Physician fail to maintain a Full-Time Private Practice of Medicine in the Community during the Cash Collections Guarantee Period, Physician shall immediately reimburse to Hospital the total sum of the Total Cash Collections Guarantee Payments and/or any other payments made by Hospital under this Agreement to Physician to date.

[*Id.* ¶ D.6].

During the thirty-six-month lifespan of the Recruitment Agreement, Shelbyville Hospital sued Dr. Mosley, alleging breach of contract after Dr. Mosley was absent from his practice for twenty-four consecutive business days while participating in an African mission trip in 2012. [Compl., doc. 1, at 8; Mem. Op., doc. 173, at 5, 13]. Dr. Mosley responded by bringing numerous counterclaims, [Countercl., doc. 22; Am. Countercl., doc. 31], which prompted Shelbyville Hospital to move for their dismissal, [Pl.'s Mot. Dismiss, doc. 32]. The Court dismissed most of the counterclaims. [Mem. Op. Granting Dismissal, doc. 41, at 1–20]. Dr. Mosley later requested voluntary dismissal of the remainder of them, [Def.'s Mot. Voluntary Dismissal, doc. 136], and the Court granted their dismissal, [Order Granting Dismissal, doc. 159].

The case then moved through discovery and Shelbyville Hospital eventually moved for summary judgment on its claim of breach, contending that Dr. Mosley, while he was in Africa, breached the Recruitment Agreement during the first eighteen months by "violat[ing] the 10-day limit" under paragraph B.4. [Pl.'s Br., doc. 142, at 23]. As recompense, it requested $1,013,000 in Guarantee Payments under paragraph D.6, interest, and attorney's fees. [*Id.* at 24–25]. The Court determined that Dr. Mosley

breached paragraph B.4 because he "missed more than ten consecutive days of work in late 2012," and it awarded summary judgment to Shelbyville Hospital on the issue of liability only. [Mem. Op. at 30]. It made no legal conclusions or factual findings on the issue of damages. Instead, it reserved ruling on damages and set a hearing in which it intended to allow the parties to present evidence and make legal arguments. [*Id.* at 30–31]. It also ordered Shelbyville Hospital to submit proof of its damages. [*Id.*].

Leading up to the hearing, Dr. Mosley argued that he is entitled to a setoff or reduction in damages because, after he completed his mission trip in 2012, he returned to the Full-Time Private Practice of Medicine in Shelbyville and "continued to treat his patients and perform surgeries as he had before." [Def.'s Resp., doc. 180, at 4]. He requested the opportunity "to put on proof" at the hearing to show that he returned to his practice and is therefore entitled to receive a setoff "based upon partial continued performance." [*Id.* at 2, 7, 15]. As to the exact amount of the setoff, Dr. Mosley proposes that "[a]ny amount of compensatory damages . . . should be reduced proportionally based upon the work [he] did provide under the contract." [*Id.* at 7].

On May 24, 2017, the Court held the evidentiary hearing and heard evidence and arguments from the parties. After the hearing, the parties filed legal briefs with the Court, in which they offered proposed findings of fact and further legal arguments. The Court has carefully reviewed them. It is now ready to address whether Shelbyville Hospital, as the movant, has established its right to compensatory damages—that is, reimbursement of the Guarantee Payments totaling $1,013,000—or whether genuine issues of material fact remain in the record and require a trier of fact's deliberation.

## II.  LEGAL STANDARD

Summary judgment is proper when the moving party shows, or "point[s] out to the district court," *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986), that the record—the admissions, affidavits, answers to interrogatories, declarations, depositions, or other materials—is without a genuine issue of material fact and that the moving party is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a), (c). The moving party has the initial burden of identifying the basis for summary judgment and the portions of the record that lack genuine issues of material fact. *Celotex*, 477 U.S. at 323. The moving party discharges that burden by showing "an absence of evidence to support the nonmoving party's" claim or defense, *id.* at 325, at which point the nonmoving party, to survive summary judgment, must identify facts in the record that create a genuine issue of material fact, *id.* at 324.

Not just any factual dispute will defeat a motion for summary judgment—the requirement is "that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it may affect the outcome of the case under the applicable substantive law, *id.*, and an issue is "genuine" if the evidence is "such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In short, the inquiry is whether the record contains evidence that "presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52. When ruling on a motion for summary judgment, a court must view the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). "[T]he

judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A court may also resolve pure questions of law on a motion for summary judgment. *See Hill v. Homeward Residential, Inc.*, 799 F.3d 544, 550 (2015).

## III. ANALYSIS

As an initial matter, the Court emphasizes that Dr. Mosley's request for a setoff is not something that he fancifully plucked out of the ether here in the final stages of this litigation. In his Amended Answer [doc. 21], he "adopted herein by reference and incorporated as an affirmative . . . defense" numerous counterclaims. [*Id.* ¶ 39]. One of those counterclaims included an assertion that he is "entitled to a setoff for his continued practice in Shelbyville." [Am. Countercl. ¶ 49; Countercl. ¶ 36]. The Court's view has been, all along, that this assertion preserved his right to a setoff as an affirmative defense. [*See* Mem. Op. Den. Discovery, doc. 201, at 6; Mem. Op. Den. Recons., doc. 225, at 11].

Shelbyville Hospital has pushed back against this view, arguing that Dr. Mosley cannot now rely on setoff as an affirmative defense because the Court already dismissed his counterclaims. [Hr'g Tr., doc. 230, at 5:7–25; 6:1–2]. Shelbyville Hospital contends that Dr. Mosley's defense of setoff is a casualty of the Court's order of dismissal because it was "embedded" in his counterclaim of unjust enrichment, [*id.* at 5:19–21], and it procured dismissal of this counterclaim, [Mem. Op. Granting Dismissal at 18–20]. Even if the Court's order of dismissal did not nullify his right to a setoff, it argues that he still lacks this right because under Tennessee law a setoff is available only if a defendant has

an "independent action . . . against the plaintiff." [Hr'g Tr. at 5:4–5]. Because Dr. Mosley has no counterclaims or any other claims left standing, Shelbyville Hospital believes that his demand for a setoff has no valid basis under Tennessee law, and it "object[s] to him now coming back and [reasserting it]." [*Id.* at 7:5–6].

Although Shelbyville Hospital did obtain dismissal of several counterclaims, including Dr. Mosley's counterclaim of unjust enrichment, this counterclaim's fate has little to do with his defense of setoff—even if his allegations of setoff were "embedded" in his allegations of unjust enrichment. After all, a setoff is not one of the elements of an unjust enrichment claim, *see Freeman Indus., LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (listing the elements of unjust enrichment), and under Tennessee law, a setoff can and oftentimes does operate as a stand-alone affirmative defense, *see W.R. Naylor & Son Constr. Co. v. Campbell*, 1989 WL 18770, at *1 (Tenn. Ct. App. Mar. 3, 1989) (referring to "the defense of set-off"), *perm. app. denied*, (Tenn. 1988).[4] Simply, because Shelbyville Hospital did not move for dismissal of Dr. Mosley's allegations pertaining to a setoff, it did not secure their dismissal.

And although the Court later granted Dr. Mosley's own request for dismissal of his surviving counterclaims, this second wave of dismissal did not extinguish his right to pursue setoff as a defense either. In granting dismissal, the Court was clear that it "gives no opinion on [D]r. Mosley's right to establish affirmative defenses similar in theory to those claims that have been dismissed." [Order Granting Dismissal at 1]. The Court's

---

[4] Dr. Mosley asserted his right to a setoff in a paragraph that contained no allegations of unjust enrichment. In that paragraph, he pleaded that in addition to his other claims he is "*also* entitled to a setoff." [Am. Countercl. ¶ 49 (emphasis added)].

language is consistent with the way that Dr. Mosley fashioned his request for dismissal; he petitioned the Court "to dismiss his claims" but to permit him to "move forward with his allegations as defenses." [Def.'s Mot. Voluntary Dismissal at 2]. The Court's Order plainly did not curtail Dr. Mosley's ability to assert any affirmative defenses that he had pleaded—if anything, it did the opposite—and again, a setoff can and does operate as an affirmative defense. *See W.R. Naylor & Son Constr.*, 1989 WL 18770 at *1.

If Shelbyville Hospital were uncertain about the effect of the Court's order— namely about whether Dr. Mosley's defense of setoff was subject to the order—it could have moved for clarification from the Court. It did not. Dr. Mosley's bid for a setoff therefore is viable, preserved in his Amended Answer as a properly pleaded defense, and he has every right to raise it now to challenge the amount of compensatory damages that he owes to Shelbyville Hospital. The only remaining question is whether he can legally pursue a setoff without a counterclaim or another independent claim in tow. The answer to that question depends on the source from which he purports to derive his right to receive a setoff—that is, whether he portrays his right as originating in common law, equity, or the Recruitment Agreement itself.

"The fundamental philosophy of all setoffs . . . is that a party being sued for money may claim entitlement to money from the party bringing the suit[.]" *Conister Tr. Ltd. v. Boating Corp. of Am.*, No. M1998-00949-COA-R3-CV, 2002 WL 389864, at *18 (Tenn. Ct. App. Mar. 14, 2002). Although a defendant's right to a setoff is "a common-law right," *id.* (quotation omitted), it has its genesis as "an equitable doctrine" and remains attainable in equity, *id.* at *20; *see id.* at *19 ("This court has also allowed a

party to assert a claim of setoff where 'complete justice and equity cannot be meted out to the parties' otherwise." (citing *Haverlah v. Memphis Aviation, Inc.*, 674 S.W.2d 297, 307 (Tenn. Ct. App. 1984); *Moore v. Howard Pontiac-Am., Inc.*, 492 S.W.2d 227, 230 (Tenn. Ct. App. 1972))). Shelbyville Hospital is accurate in its contention that a setoff is unavailable to a defendant who does not have an independent cause of action against a plaintiff. *See id.* at *19. ("A setoff must be a valid claim for which the defendant might have sued the plaintiff and recovered. In other words, a setoff claim must be sufficient to support an independent action by the defendant against the plaintiff." (citing *Howard v. Abernathy*, 751 S.W.2d 432, 434 (Tenn. Ct. App. 1988); *Combustion Eng'g Co. v. McFarland*, 209 Tenn. 75, 79 (Tenn. 1961))). This is true whether a defendant pursues a legal or an equitable setoff. *See Combustion Eng'g*, 209 Tenn. at 79.

In some ways, Dr. Mosley's request for a setoff sounds in equity, [*see* Def.'s Resp. at 7 (attesting that "even if insufficient under the contract," Dr. Mosley's "continued practice . . . should reduce the amount" of damages)], and up to this point, the Court has interpreted it as having equitable overtones, [*see* Mem. Op. Den. Recons. at 2 (stating that the Court has been under the impression that Dr. Mosley's request is "equitable in nature")]. The Court, in part, derived its interpretation from the fact that a setoff is traditionally most commonplace in equity. *Conister*, 2002 WL 389864 at *20. But leading up to the hearing, Dr. Mosley strenuously objected to the Court's interpretation of his request as equitable in nature. He stressed that the Recruitment Agreement *itself* provides his right to a setoff. [Mot. Recons., doc. 222, at 2]. In his own words, he stated that "[a]ll of his arguments in opposition to Plaintiff's proof of damages are legal, rather

than equitable, because all of them concern the extent (if any) of the damages claimed by the Plaintiff for the alleged breach of the Recruitment Agreement." [*Id.*].

The Court has not yet considered whether this recent articulation of Dr. Mosley's position is consistent with the position he has voiced in the record up to this point. While the Court, without expressing its opinion one way or another, has since left open the possibility that Dr. Mosley's request for a setoff could have "a legal basis, an equitable basis, or otherwise," [Mem. Op. Den. Recons. at 12], it is unwilling to construe his request in a way that would take Shelbyville Hospital by surprise at this late hour in the litigation, *see Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 350 (1971) (stating that Federal Rule of Civil Procedure 8(c)'s requirement that a defendant must affirmatively plead a defense in the answer is meant to provide the plaintiff with notice of the defense and a chance to rebut it). But Shelbyville Hospital has not lacked notice of Dr. Mosley's request for a setoff, whether legal or equitable, or a chance to rebut it. In its legal brief on damages and its post-hearing brief, it argued that Dr. Mosley has no right to a setoff in terms of equity or in terms of the Recruitment Agreement's legal framework. [Pl.'s Reply, doc. 184, at 1–12; Pl.'s Post-Hearing Br. at 9–10, 14–16].

In retracing Dr. Mosley's request for a setoff to the original language he used in his Amended Answer—and in reviewing Shelbyville Hospital's arguments in response to his request—the Court is confident that he intended to claim a setoff that is contractual in nature. In the Amended Answer, he expresses his entitlement to a setoff in these exact terms: "Mosley is also entitled to a setoff for his continued practice in Shelbyville under the non-compete clause of the Recruitment Agreement with Heritage Medical Center

operating under the forgiveness period." [Am. Countercl. ¶ 49].[5] Dr. Mosley's reference to the non-compete clause is not clear to the Court, but his reference to the forgiveness period is undoubtedly an invocation of paragraph D.7. Shelbyville Hospital, too, has interpreted Dr. Mosley's request as one that falls—or at least should fall—under paragraph D.7, contending that paragraph D.7 has "express conditions for forgiveness," that it encapsulates the parties' agreed-to terms as to a setoff, and that it is therefore the lone legal mechanism through which he can claim a setoff. [Pl.'s Reply at 5]. According to Shelbyville Hospital, "[h]e cannot now invent a new mechanism for forgiveness without depriving the Hospital of the benefit of its bargain." [*Id.*].

In sum, the parties ostensibly share the belief that Dr. Mosley's request for a setoff is legal in nature, rather than equitable, and the parties depict paragraph D.7 as the relevant landscape on which the Court must conduct its analysis. [*Compare id.* (arguing that paragraph D.7 offers the only basis for a setoff), *with* Am. Countercl. ¶ 49 (pleading that "Mosley is . . . entitled to a setoff for his continued practice in Shelbyville . . . under the forgiveness period")]. The Court will therefore decide whether Dr. Mosley is entitled to a setoff under paragraph D.7. As is true with any contractual analysis, the Court must interpret and enforce the Recruitment Agreement based on its plain terms, which are the lodestars from which the Court ascertains the parties' intent. *See Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002) ("The central tenet of contract construction is that the intent of the contracting parties at the time of executing the agreement should govern. The intent of the parties is presumed to be that specifically

---

[5] Shelbyville Hospital does business as Heritage Medical Center.

expressed in the body of the contract." (citation omitted)).[6] The Court cannot look beyond these terms unless they are ambiguous. *Bokor v. Holder*, 722 S.W.2d 676, 679 (Tenn. Ct. App. 1986). If they are ambiguous, "the parties' intent cannot be determined by a literal interpretation of the language," and the Court "must resort to other rules of construction." *Pylant v. Spivey*, 174 S.W.3d 143, 152 (Tenn. Ct. App. 2003) (citing *Planters Gin*, 78 S.W.3d at 890). A contract's terms, however, are ambiguous only when they are "susceptible to more than one reasonable interpretation." *Id.* (citing *Planters Gin*, 78 S.W.3d at 890).

Because the Court has to decide whether and to what extent Dr. Mosley is entitled to a setoff under paragraph D.7's plain language, it does not consider the common-law principles of setoff—like the rule that "a setoff claim must be sufficient to support an independent action . . . against the plaintiff," *Conister*, 2002 WL 389864 at *19—to have bearing on its analysis. Instead, "the intent of the parties must prevail." *Piper Indus., Inc. v. First Tenn. Bank, N.A.*, 1986 WL 4283, at *3 (Tenn. Ct. App. Apr. 11, 1986) (citing *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973)); *see Planters Gin*, 78 S.W.3d at 890 (stating that "the intent of the contracting parties at the time of executing the agreement should govern"). Also, because a setoff, in plain terms, is simply a deduction of money from a debt, *see Setoff*, *Black's Law Dictionary* (10th ed.

---

[6] The interpretation of a contract is a question of law, not fact, *Mark VII Transp. Co. v. Responsive Trucking, Inc.*, 339 S.W.3d 643, 647 (Tenn. Ct. App. 2009)—unless "ambiguity remains after the court applies the pertinent rules of construction," *Adkins v. Bluegrass Estates, Inc.*, 360 S.W.3d 404, 411 (Tenn. Ct. App. 2011) (quoting *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002)). In that case, "a factfinder may use extrinsic or parol evidence . . . to guide the court in construing the contract." *Id.* (citing *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 612 (Tenn. 2006)).

2014) ("Set-off signifies the subtraction or taking away of one demand from another opposite or cross demand[.]" (quotation omitted)), the Court will first consider whether Shelbyville Hospital, as the movant for damages under paragraph D.6, has established its right to a debt. Only then would the Court have a minuend, or ascertained amount, from which it could even begin to deduct a setoff.

## A. Damages

As the movant for summary judgment under paragraph D.6, Shelbyville Hospital has the legal burden to establish, beyond a genuine issue of material fact, not only its right to damages but also the amount of damages. *See GSB Contractors, Inc. v. Hess*, 179 S.W.3d 535, 541 (Tenn. Ct. App. 2005) ("Determinations concerning the amount of damages are factually driven." (citation omitted)). In this vein, the Court has already noted that Shelbyville Hospital requested summary judgment on the issue of damages but the Court reserved ruling on that issue until now. The summary judgment standard and the legal burdens that accompany it therefore remain in play, with the initial burden resting on Shelbyville Hospital not only as to damages, which is of course part of its breach of contract claim, but also as to Dr. Mosley's affirmative defense of setoff. *See Celotex*, 477 U.S. at 327 (stating that the movant for summary judgment has the burden to establish that "the claims *and defenses* have no factual basis" (emphasis added)).

### 1. *Shelbyville Hospital's Motion for Compensatory Damages*

In beginning its analysis, the Court reiterates the fact that Shelbyville Hospital, in moving for summary judgment, contended that Dr. Mosley breached paragraph B.4 and

has to repay, as damages under paragraph D.6, the total Guarantee Payments that it paid to him. [Pl.'s Br. at 23; Pl.'s Post-Hearing Br. at 2]. Once again, paragraph B.4 provides that Dr. Mosley cannot fail "to render services pursuant to this Agreement for a period of ten (10) consecutive business days during" the first eighteen months. The Court previously awarded summary judgment to Shelbyville Hospital based on Dr. Mosley's breach of this specific paragraph: "There is no question that Dr. Mosley missed more than ten consecutive business days of practice in November and December. He therefore breached Section B.4 of the Agreement." [Mem. Op. at 14]. Now, the Court has to shift its focus to paragraph D.6, which states:

> Should the Physician fail to maintain a Full-Time Private Practice of Medicine in the Community during the Cash Collections Guarantee Period, Physician shall immediately reimburse to Hospital the total sum of the Total Cash Collections Guarantee Payments and/or any other payments made by Hospital under this Agreement to Physician to date.

[Recruitment Agreement ¶ D.6]. Shelbyville Hospital, to dispatch its burden as the movant and establish its right to damages under paragraph D.6's plain terms, has to vault two hurdles. It has to establish, beyond any genuine issue of material fact, the amount of the Guarantee Payments that it tendered to Dr. Mosley "to date" of the breach, and it must show that he did not engage in the Full-Time Private Practice of Medicine during the first eighteen months. [*Id.*].

### i. The Guarantee Payments to Date of the Breach

In establishing the total amount of Guarantee Payments that it paid to Dr. Mosley to date of the breach, Shelbyville Hospital discharges its burden with relative ease. First,

it directs the Court to evidence showing that it issued $1,013,000 in Guarantee Payments to Dr. Mosley through November 2012. [Mitchell Frank Decl., doc. 178-1, ¶ 4; *see* Accounts Payable Listing, doc. 178-1, Ex. A, at 3]. Second, it also illustrates that the record lacks evidence refuting this amount, citing, among other evidence, Dr. Mosley's rendition of undisputed facts. [Pl.'s Post-Hearing Br. at 3]. In Dr. Mosley's narration of undisputed facts, he states:

> 13. The Hospital made payments totaling $1,013,000 to Dr. Mosley prior to November 15, 2012. (Mitchell Frank Decl. ¶ 5.)

> Response:

> Undisputed.

[Def.'s Statement Undisputed Facts, doc. 148-1, at 4]. In addition, Shelbyville Hospital identifies evidence showing that Dr. Mosley has not repaid any portion of the $1,013,000 in Guarantee Payments. [Pl.'s Post-Hearing Br. at 3 (citing Hr'g Tr. at 10:15–17)].

The burden now shifts to Dr. Mosley, who must identify evidence of a genuine issue of material fact as to Shelbyville Hospital's figure of $1,013,000. He fails to satisfy his burden, citing no evidence creating a dispute as to this amount. During the evidentiary hearing, Dr. Mosley conceded that Shelbyville Hospital provided him with $1,013,000:

> Q: Dr. Mosley, you understand that we are here due to a business arrangement that you had with the Shelbyville Hospital?

> A: I do understand that.

> Q: And pursuant to that arrangement, you performed the private practice of medicine in Shelbyville. Is that correct?

> A: That's correct.

Q: Now, you were paid an amount by the hospital?

A: Correct.

Q: And what was that amount?

A: $1,013,000.00.

[Hr'g Tr. at 9:14–23]. Dr. Mosley's testimony is a facsimile of his own rendition of undisputed facts.[7] Because he does not contest Shelbyville Hospital's evidence showing that it paid $1,013,000 in Guarantee Payments to him, the record conclusively establishes that he collected this amount to date of the breach.

## ii. The Full-Time Private Practice of Medicine

Although the record conclusively shows that Shelbyville Hospital paid $1,013,000 in Guarantee Payments to Dr. Mosley, the question of whether Dr. Mosley actually *owes* this amount under paragraph D.6 is an altogether separate one that depends on whether he maintained the Full-Time Private Practice of Medicine during the first eighteen months:

> *Should the Physician fail to maintain a Full-Time Private Practice of Medicine in the Community during the Cash Collections Guarantee Period*, Physician shall immediately reimburse to Hospital the total sum of the Total Cash Collections Guarantee Payments and/or any other payments made by Hospital under this Agreement to Physician to date.

[Recruitment Agreement ¶ D.6 (emphasis added)]. Again, the term "Full-Time Private Practice of Medicine" means a "minimum average of forty (40) hours per week of direct patient contact hours and patient care activities." [*Id.* ¶ B.1].

---

[7] Dr. Mosley also acknowledges in his Amended Answer that Shelbyville Hospital paid him $1,013,000 in Guarantee Payments: "It is admitted that the Hospital eventually paid Mosley the total cash collections guarantee amount of $1,013,000." [Am. Answer ¶ 13]. The Court notes, however, that a pleading does not constitute evidence for the purpose of summary judgment. *Shreve v. Franklin Cty.*, 743 F.3d 126, 136 (6th Cir. 2014).

When the Court previously awarded summary judgment to Shelbyville Hospital on liability, it concluded that the record lacked a genuine factual dispute as to the dates of the breach, which spanned twenty-four business days. [Mem. Op. at 13]. Dr. Mosley left his practice on November 14, 2012, and returned on December 17, 2012. [*Id.*]. During this specific, four-week timeframe, he incontrovertibly contributed zero hours of direct patient contact toward his patients in Shelbyville. [Recruitment Agreement ¶ D.6; *see* Hr'g Tr. at 17:21–22 (containing Dr. Mosley's testimony, during which he said that he postponed his patients' appointments and surgeries while he was in Africa); *see* Dr. Mosley Dep., doc. 140-1, at 79:2–15 (testifying that he did not reinitiate contact with patients in Shelbyville until December 17, 2012)]. A calculation of Dr. Mosley's average hours per week during his four-week absence looks like this:

| Week | Hours of Direct Patient Contact |
|---|---|
| November 14–21, 2012 | 0 |
| November 23–30, 2012[8] | 0 |
| December 1–8, 2012 | 0 |
| December 9–16, 2012 | 0 |

| | |
|---|---|
| **Average Hours Per Week (0 total hours/4 weeks)** | **0** |

---

[8] The Court excludes November 22—the Thanksgiving holiday—from its calculation because Dr. Mosley was not required to engage in the Full-Time Private Practice of Medicine on holidays. [Recruitment Agreement ¶ B.1]. He was not exempt, however, from the Full-Time Private Practice of Medicine on weekends. [*Id.*].

Between November 14, 2012, and December 16, 2012, Dr. Mosley quite clearly did not meet the minimum average of forty hours per week of direct patient contact.[9]

But during redirect at the evidentiary hearing, Dr. Mosley raised the argument that the Recruitment Agreement's use of the language "average of forty (40) hours per week" requires a computation that encompasses the entirety of the first eighteen months, not merely a truncated four-week stretch. [Hr'g Tr. at 65:12–14]. Specifically, Dr. Mosley testified:

> Q: Do you know through the entire course of your work in Shelbyville, what was your average hours per week of direct patient contact and patient care activities, if you recall?
>
> A: I believe I ended up in the high 50s, low 60s. Average number of hours per week.
>
> . . . .
>
> Q: And does the contract require a minimum average of 40 hours per week?
>
> A: Yes. The contract specifically says a minimum average of 40 hours per week.
>
> Q: And so it's not—it's not 40 hours every week. It's an average, isn't' it?
>
> Objection.

_____

[9] During the evidentiary hearing, Dr. Mosley testified that he performed numerous tasks during his flights to and from Africa and while he was staying in Africa. He testified that he reviewed radiology reports, physical therapy reports, laboratory reports, requests for disability insurance, reports for workers' compensation, and information about his office's electronic medical record system. [Hr'g Tr. at 19:1–15]. But Dr. Mosley cannot realistically argue that his performance of any of these tasks constitutes direct patient contact. In fact, he later went on to refer to these tasks as "things that you deal with when the patient is not present." [*Id.* at 24:23–24].

[*Id.* at 65:12–14; 66:16–22]. This interpretation of the Recruitment Agreement is not a new argument from Dr. Mosley. Before the hearing, Dr. Mosley responded in opposition to Shelbyville Hospital's request for compensatory damages, arguing against damages by noting that, overall, "he averaged at least forty hours per week." [Def.'s Resp. at 3].

Besides, Shelbyville Hospital moved for damages under paragraph D.6, so this paragraph's language does not take it off guard. Paragraph D.6 quite plainly states that it is entitled to recover damages only if it shows that Dr. Mosley, during the first eighteen months, failed to average a minimum of forty hours per week of direct patient contact and patient care activities. As the movant, Shelbyville Hospital has the burden to show, beyond a genuine issue of material fact, that Dr. Mosley failed to attain this average. By its own admission, however, it never even argued that Dr. Mosley failed to average forty hours per week, much less attempted to establish his failure to do so based on uncontroverted record evidence:

> On December 16, 2015, the Hospital moved for summary judgment on its breach of contract claim under Paragraphs B.4 and D.6 of the Recruitment Agreement. In its Complaint, the Hospital did plead that Mosley breached not only Paragraph B.4 but also Paragraph B.1, which required Mosley, among other things, to average 40 hours of direct patient contact every week for 36 months. *However, neither the Hospital nor Mosley moved for summary judgment on the issue of whether Mosley averaged 40-hours per week of direct patient contact under Paragraph B.1.* The summary judgment motion concerned Paragraph B.4.

[Pl.'s Post-Hearing Br. at 2 (emphasis added) (citations omitted)]. Shelbyville Hospital, in acknowledging that it never attempted to show that Dr. Mosley failed to average forty hours of work per week, appears to believe that his breach of "the 10-day limit" under paragraph B.4 is sufficient to entitle it to damages under paragraph D.6. [Pl.'s Br. at 23].

But unlike paragraph B.4—which requires it to establish that Dr. Mosley failed to render services for ten consecutive business days—paragraph D.6 requires it to establish that Dr. Mosley failed to average forty hours per week. An absence for ten business days under paragraph B.4 and a failure to average forty hours per week under paragraph D.6— though they may overlap with each other—are not, by their plain language, the same measure. Paragraph B.4 measures a breach by a simple tally of total days, whereas paragraph D.6 measures, after the breach, the ensuing right to recover damages not by a rote accumulation of days but by an average of hours per week during the first eighteen months. A calculation of a weekly average, by its ordinary meaning, requires the Court to take the sum of Dr. Mosley's hours over "a broad sample of" weeks and divide that sum by the total number of weeks in the sample. *Average*, *Black's Law Dictionary*; *see* James Nicholson, *The Concise Oxford Dictionary of Mathematics* 24 (5th ed. 2014) (defining the term "average" as the arithmetic mean); *see generally Battery All. Inc. v. T&L Sales Inc.*, No. W2015-00201-COA-RS-CV, 2015 WL 6873202, at *8 (Tenn. Ct. App. Nov. 9, 2015) ("When a term is not defined within a contract, the court may utilize a dictionary definition of the term to gauge its meaning." (citing *Travelers Indem. Co. of Am. v. Moore & Assocs., Inc.*, 216 S.W.3d 302, 308 (Tenn. 2007))).

The Recruitment Agreement, however, provides the Court with no example or instruction as to *how* to calculate this average—or more precisely, as to how many weeks it must use to calculate this average. Shelbyville Hospital appears to argue that the Court may rely on the four-week sample between November 14, 2012 and December 16, 2012, to determine whether Dr. Mosley maintained an average of forty hours per week. And

presumably, based on this argument, Shelbyville Hospital believes that the Court may reasonably rely on any indiscriminate block of weekly samples during the first eighteen months—whether two weeks, four weeks, or another number. Dr. Mosley, on the other hand, believes that the Court cannot arrive at a fair and reasonable average unless it takes into account the full body of his work over the length of the Recruitment Agreement. [*See* Hr'g Tr. at 65:12–14; Def.'s Resp. at 3].

Each party's interpretation of the term "average" is consistent with its literal meaning. After all, each offers a calculation of an arithmetic mean of Dr. Mosley's hours per week. The term "average," then, is a wooly one because an ordinary application of the term yields different numerical results depending on whether the weekly samples are broad or narrow. Because the term's literal interpretation allows for the formulation of more than one outcome, the Court must look beyond its plain meaning and employ other rules of contractual interpretation to ascertain the parties' intent. *See Planters Gin*, 78 S.W.3d at 890 (stating that a term is ambiguous if it is "susceptible to more than one reasonable interpretation," and if "the intention of the parties cannot be determined by a literal interpretation of the language . . . the courts must resort to other rules of construction" (citation omitted)).

Tennessee courts have enumerated several rules of construction. They include the rule that no term in a contract is surplusage or without meaning, *Graybar Elec. Co. v. Davco Corp.*, 1985 WL 3429, at *2 (Tenn. Ct. App. Nov. 1, 1985), that courts must interpret a contract's terms fairly and reasonably, *Johnson v. Welch*, No. M2002-00790-COA-R3-CV, 2004 WL 239756, at *8 (Tenn. Ct. App. Feb. 9, 2004), that courts must not

rewrite a contract's terms under the pretense of interpreting them, *id.* at *7, and that the interpretation of a contract "is not dependent on any single provision, but upon the entire body of the contract and the legal effect of it as a whole," *Adkins v. Bluegrass Estates, Inc.*, 360 S.W.3d 404, 411 (Tenn. Ct. App. 2011) (citing *Aetna v. Cas. & Sur. Co. v. Woods*, 565 S.W.2d 861, 864 (Tenn. 1978)); *see Teter v. Republic Parking Sys., Inc.*, 181 S.W.3d 330, 342 (Tenn. 2005) ("[A]ll provisions in [a] contract should be construed in harmony with each other, if possible, to promote consistency and to avoid repugnancy between the various provisions." (quotation omitted)).

Against the backdrop of the Recruitment Agreement as a whole, the Court is unconvinced that the parties intended the term "average" to require a measure of only a portion of Dr. Mosley's performance. The parties divided the Recruitment Agreement into two clearly defined timeframes, the first eighteen months and the second eighteen months. Based on their arrangement of the Recruitment Agreement, its provisions necessarily apply to the parties' performance over a timeline that spans the first eighteen months or the second eighteen months—not less. While true, paragraph B.4 measures a breach by ten days, the Court—based on the Recruitment Agreement's structure from beginning to end—does not consider this one paragraph to be a token of the parties' intent to measure Dr. Mosley's average weekly performance with a touchstone smaller than eighteen-months, or seventy-eight weeks. *See Adkins*, 360 S.W.3d at 411 (stating that courts, when interpreting a contract, must look beyond a single provision in isolation). Instead, the Court views the parties' use of the boxy ten-day period in paragraph B.4, in juxtaposition to the capacious term "average" in paragraph D.6, as

illuminative. *See Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999) (acknowledging that a court must interpret a contract "from beginning to end" because any one provision may "illuminate" another (quotation omitted)).

Under paragraph B.4, Dr. Mosley had a duty to discharge his obligations on "a regular and continuous basis," and the parties quantified a breach of this duty in days— that is, as a failure to work for ten straight business days. They could have quantified a breach of Dr. Mosley's duty to perform the Full-Time Private Practice of Medicine in an identical or similar way—as a failure to work a certain number of sequential days or hours per week. They did not. Instead, they chose to define it as an average. The Court must construe their choice as a deliberate and meaningful one. *See Graybar Elec.*, 1985 WL 3429 at *2 (stating that a court must not view a term as redundant, surplusage, or meaningless). An average inherently allows for some flexibility and fluctuation. For instance, as a short example, a person can average forty hours per week by working a relatively wide range of hours over a three-week period: forty hours in the first week, twenty hours in the second week, and sixty hours in the third week.

The Recruitment Agreement, in holding Dr. Mosley to an average of forty hours per week, fairly and reasonably implies that the parties anticipated a need for flexibility in Dr. Mosley's weekly work schedule. Indeed, one of the Recruitment Agreement's main, overarching purposes is "to assist Physician in *establishing* Physician's practice in the Community." [Recruitment Agreement at 2 (emphasis added)]. In several provisions throughout the Recruitment Agreement, the parties highlight their mutual understanding that Dr. Mosley's practice, particularly during the first eighteen months, would require

time to develop. For example, they agreed to provisions concerning promotion and marketing of Dr. Mosley's practice. [*Id.* ¶ B.3]. Shelbyville Hospital also consented to provide Dr. Mosley with "reasonable medical practice establishment assistance," with the intent of aiding with "start-up." [*Id.* ¶ C.2]. And of course, the Guarantee Payments were meant to subsidize Dr. Mosley's practice if it "d[id] not realize" a certain monthly income during the first eighteen months. [*Id.* ¶ D.2].

Based on these provisions, and the availability of the Guarantee Payments during the first eighteen months, the parties appeared to envision that Dr. Mosley's practice needed eighteen months to become self-sustaining. An average of Dr. Mosley's performance over a mere portion of those eighteen months is therefore not a complete picture. The full first eighteen months, or seventy-eight weeks, is the only fair and reasonable timeframe over which to average Dr. Mosley's hours. An average over this timeframe is flexible but not so flexible that it distorts the Recruitment Agreement's meaning. Indeed, the Court has been mindful of the Recruitment Agreement's structure, its purpose, and its provisions in which Shelbyville Hospital, through various financial incentives and concessions, recognizes that Dr. Mosley's practice could take in fewer patients—and provide fewer opportunities for patient contact—on the frontend than the backend. An average that accounts only for his hours on the frontend, only his hours on the backend, or a period of hours in between would be akin to a weighted average, not a true arithmetic mean. And in fact, a measure of his average hours over the full eighteen months is also consonant with paragraph D.6, under which Shelbyville Hospital has moved for damages. After all, paragraph D.6 requires a showing that Dr. Mosley did not

maintain the Full-Time Private Practice of Medicine "[d]uring the Cash Collections Guarantee Period," [*id.* ¶ D.6], which, by definition, is eighteen months in length and is the first eighteen months, [*id.* at 1, ¶ A.5]. For these reasons, Dr. Mosley's four-week hiatus in late 2012 does not establish, without additional evidence of non-performance throughout the first eighteen months, his failure to average forty hours per week and maintain the Full-Time Private Practice of Medicine.

Shelbyville Hospital, however, argues against the Court's interpretation of the term "average," claiming it "would produce absurd results." [Pl.'s Post-Hearing Br. at 19–20]. Specifically, Shelbyville Hospital maintains that Dr. Mosley, under the Court's interpretation, could average "80 hours during the first six months of one year," "do nothing for the next six months," and still "satisfy the contract." [*Id.* at 20.]. But paragraph B.4's restriction against ten-day absences is a safeguard against this scenario, preventing Dr. Mosley from leaving Shelbyville for sizable chunks of time and abusing the flexibility that a weekly average affords him. Shelbyville Hospital knows this well because it obtained summary judgment under paragraph B.4 on the issue of breach.

As to the issue here—damages—the Court's interpretation also does not produce the illogical results that Shelbyville Hospital forecasts. Rather, under the Court's interpretation, Dr. Mosley would not have the freedom to abscond from his practice for more than ten days and avoid paying damages for it. Paragraph E.2 forestalls this possibility:

> Any material breach of this Agreement by Physician or failure by Physician to fulfill any material provisions of this Agreement that has not been cured within thirty (30) days of receipt of written notice from Hospital to

physician shall entitle Hospital, at its option, to terminate this Agreement immediately. In addition, Hospital may recover any payments as well as an amount equal to the value of any other assistance provided pursuant to this Agreement.

[Recruitment Agreement ¶ E.2]. Unlike paragraph D.6, paragraph E.2 is more fluid, not requiring a showing that Dr. Mosley, as a prerequisite to damages, failed to average forty hours per week. By its plain terms, it allows Shelbyville Hospital to "recover *any* payments" for "*[a]ny* material breach," including a breach of paragraph B.4's ten-day limit. [*Id.* (emphasis added)]. Shelbyville Hospital, however, does request damages under paragraph E.2, and the Court cannot sua sponte consider Shelbyville Hospital's right to recover damages under it. *Cf. Thomas v. Mahoning Cty. Jail*, No. 16-3495, 2017 WL 3597428, at *2 (6th Cir. Mar. 21, 2017) ("[I]t is ordinarily error for a district court to raise [an argument] sua sponte." (citation omitted)).[10] Instead, it moves for damages under paragraph D.6, which clearly entails a showing that Dr. Mosley did not maintain the Full-Time Private Practice of Medicine. That showing requires Shelbyville Hospital to establish—beyond a genuine issue of fact—that Dr. Mosley did not average forty hours of work per week over seventy-eight weeks. By its own admission, it has not presented argument or evidence to this effect, [Pl.'s Post-Hearing Br. at 2], and it therefore fails to meet its burden as the movant for summary judgment. A jury must now resolve the issue of damages.

---

[10] Besides, Shelbyville Hospital's decision not to invoke paragraph E.2 may well have been a strategic one. Based on paragraph E.2's plain language, Shelbyville Hospital, to trigger this paragraph, first had to terminate the Recruitment Agreement. The record is not fully clear as to whether it did terminate the Recruitment Agreement. [*See* Letter, doc. 1-2, at 1 (threatening legal action in response to Dr. Mosley's breach but providing no express indication of an intent to terminate the Recruitment Agreement)].

2. *Dr. Mosley's Defense of Setoff*

Although Shelbyville Hospital's evidence does not establish its right to damages, the Court will now—in an effort to narrow the issues for the jury—consider whether it has surmounted its burden for summary judgment on Dr. Mosley's defense of setoff. As the Court noted earlier in this Opinion, a setoff is plainly and simply a deduction of money from a debt. *See Setoff*, *Black's Law Dictionary*. This is equally true under paragraph D.7, which allows amortization of the Guarantee Payments in one-eighteenth increments. *See Amortize*, *Black's Law Dictionary* (defining the term "amortize" as meaning "to extinguish (a debt) by gradual increments"); *see also Mark VII Transp. Co. v. Responsive Trucking, Inc.*, 339 S.W.3d 643, 647–48 (Tenn. Ct. App. 2009) (providing that contractual language "must be given its natural and ordinary meaning" (citation omitted)). Paragraph D.7 states that amortization will occur only if Dr. Mosley, during the second eighteen months, maintains the Full-Time Private Practice of Medicine:

> *During the Cash Collections Continuation Period*, which shall begin on the day following the last day of the Cash Collections Guarantee Period and continue for the number of months set forth as the Continuation Period on the Cover Page, Hospital agrees that it will cancel (amortize) one eighteenth (1/18[th]) of the Total Cash Collection Guarantee Payments made by Hospital under this Agreement for each full month Physician remains in the Full-Time Private Practice of Medicine, in Physician's Specialty, in the Community. In the event Physician fails to maintain a Full-Time Private Practice of Medicine in the Community *during the Cash Collections Continuation Period*, Physician shall immediately reimburse to Hospital the unamortized amount of the Total Cash Collections Guarantee Payments paid hereunder.

[Recruitment Agreement D.7 (emphasis added)].

The parties do not dispute that paragraph D.7 applies to the second eighteen months. [*See* Pl.'s Post-Hearing Br. at 9 (noting that paragraph D.7 begins to apply "in month 19"); Def.'s Post-Hearing Br. at 3 (recognizing that paragraph D.7 applies "over the final 18 months")]. Shelbyville Hospital, however, argues that Dr. Mosley cannot legally invoke paragraph D.7 because his breach took place during the first eighteen months. [Pl.'s Post-Hearing Br. at 9–10; Pl.'s Reply at 4]. In other words, it maintains that Dr. Mosley, to acquire a setoff under paragraph D.7, "must not breach during the initial 18 months *and* he must maintain the regular and continuous, full-time practice of medicine after the initial 18 months." [Pl.'s Post-Hearing Br. at 9]. Dr. Mosley does not respond to Shelbyville Hospital's interpretation of paragraph D.7.[11] The Court will nevertheless continue to hold Shelbyville Hospital to its burden, scrutinizing its interpretation and, to the extent permissible under the law, drawing all reasonable inferences in Dr. Mosley's favor. *Cf. In re St. Clair Clinic, Inc.*, No. 94-3943, 1996 WL 6531, at *2 (6th Cir. Jan. 8, 1996) (stating that "we will critically examine . . . [the position] advanced by the movant" even though the nonmovant did not respond to it).[12]

Paragraph D.7 states only that Dr. Mosley loses his right to a setoff if he fails to maintain the Full-Time Private Practice of Medicine during the *second* eighteen months; it is silent as to whether he also loses his right to a setoff if he commits a breach during the first eighteen months. Although a contract's silence on a pivotal issue can be

---

[11] Instead of challenging this interpretation of paragraph D.7, Dr. Mosley argues in his post-hearing brief, for the first time, that paragraphs D.6 and D.7 are legally unenforceable liquidated damages provisions—an argument that the Court will go on to address separately.

[12] The Court has already noted that the interpretation of a contract is a question law, *see Mark VII Transp.*, 339 S.W.3d at 647, and that it has license to consider questions of law on a motion for summary judgment, *see Hill*, 799 F.3d at 550.

tantamount to ambiguity, *Devore v. Synergy Gas Corp.*, No. 02A01-9309-CH-00210, 1994 WL 618610, at *3 (Tenn. Ct. App. Nov. 9, 1994), one provision's silence is not indicative of the contract's silence as a whole, *Adkins*, 360 S.W.3d at 411. Indeed, throughout the Recruitment Agreement, the parties broadcast an unmistakable intent to base Dr. Mosley's right to a setoff—and his right to receive the Guarantee Payments in the first place—on his satisfaction of every requirement in the Recruitment Agreement.

The most forceful provision that undergirds the parties' intent in this vein is paragraph D.8, which says: "[P]rovided . . . Physician has fulfilled *every obligation* under this Agreement, Physician . . . shall not be required to reimburse Hospital for amounts previously paid to Physician hereunder." (emphasis added). Similarly, paragraph E.2—a previous topic of discussion—states that a "failure by Physician to fulfill *any* material provisions of this Agreement . . . shall entitle Hospital, at its option, to . . . . recover any payments." (emphasis added). Complementing these provisions, paragraphs C.1 and D.2 prohibit Dr. Mosley from collecting an additional cent in Guarantee Payments once he breaches the Recruitment Agreement. Paragraph C.1 states that Shelbyville Hospital will provide him with Guarantee Payments "*as long as* [he] has complied with the terms of this Agreement," (emphasis added), and paragraph D.2 states that he "shall be paid *only* if [he] is in compliance with the terms of this Agreement," (emphasis added). In fact, he relinquishes his right to the Guarantee Payments even if Shelbyville Hospital concludes that he is "not making a good faith effort." [Recruitment Agreement ¶ D.4].

The Court's analysis of the Recruitment Agreement's plain language therefore illustrates that the Guarantee Payments—from their distribution to their amortization—

remained contingent on Dr. Mosley's compliance with every term and at every phase of the Recruitment Agreement. Having breached paragraph B.4, Dr. Mosley cannot now request a setoff in any amount under paragraph D.7. Shelbyville Hospital satisfies its burden for summary judgment on Dr. Mosley's defense of setoff. The Court will not permit Dr. Mosley to raise this defense at trial.

### B. Unenforceable Liquidated Damages Provisions

Shelbyville Hospital ultimately overcame Dr. Mosley's defense of setoff with a legal argument based on the Recruitment Agreement's language, precluding the need for the Court to consider evidence from the hearing. The Court, however, cannot help but notice that, at the hearing, Dr. Mosley presented little if any evidence pertinent to his right to a setoff under paragraph D.7. In fact, he did not even once mention a setoff throughout the entirety of the hearing. Following the hearing, Shelbyville Hospital made this same observation, pointing out that "Mosley's arguments and statements at the hearing were not consistent with his briefing on setoff" and that "[i]nstead of presenting proof of a setoff," he conjured a new argument. [Pl.'s Post-Hearing Br. at 4]. He used most of the hearing to contend that Shelbyville Hospital did not "suffer any financial loss" because of his four-week absence in late 2012. [Hr'g Tr. at 4:15–18]. To this end, he directed the Court's attention to a broader picture, marshaling evidence to show that his overall services and performance, throughout the Recruitment Agreement, actually provided Shelbyville Hospital with a net *gain* of more than five million dollars in

business. [*Id.* at 11:4–13,12:13–25, 13:1–10, 13:14–25, 14:1–25, 15:1–2, 15:11–25, 16:1–25, 17:1–2].

Dr. Mosley went on to expound on this evidence's purpose in his post-hearing brief, in which he proposes, for the very first time, that paragraphs D.6 and D.7—and more precisely, their "contractual formula[e]" for the calculation of damages—are unenforceable liquidated damages provisions. [Def.'s Post-Hearing Br. at 3]. He argues that Tennessee law proscribes liquidated damages provisions that lack "a reasonable relationship between the amount to be paid and the amount of damages that might reasonably be expected in the event of a breach." [*Id.* (citations omitted)]. He brands paragraphs D.6 and D.7 as unenforceable liquidated damages provisions because they have "no relationship whatsoever to any actual or anticipated injury to Plaintiff" and therefore serve only to punish him. [*Id.*]. In other words, he believes that a repayment totaling $1,013,000 is grossly disproportionate to any damages that Shelbyville Hospital incurred while he was away for twenty-four business days in 2012. [*Id.*]. In this vein, he notes that Shelbyville Hospital has submitted no evidence of any actual damages from this twenty-four-day timeframe, and without evidence of any actual damages, he decries the $1,013,000 as a penalty rather than a figure that embodies compensation for actual harm. [*Id.* at 2–3].

Dr. Mosley's argument is accurate—Tennessee courts do indeed "disfavor[] the enforcement of [] liquidated damages provision[s] when the provision[s] serve[] only to penalize the defaulting party for a breach of contract." *Guiliano v. Cleo, Inc.*, 995 S.W.2d 88, 98 (Tenn. 1999) (citation and footnote omitted). They look askance at these

provisions when they are punitive because "[t]he purpose of assessing damages in a breach of contract action is to make nonbreaching parties whole," not to censure breaching parties by forcing them to pay surplus damages. *Tinkham v. Beasley*, No. M1999-02809-COA-R3-CV, 2000 WL 1727780, at *2 (Tenn. Ct. App. Nov. 22, 2000) (citation omitted); *see Stewart Title Co. of Memphis v. First. Am. Title Ins. Co.*, 44 F. Supp. 2d 942, 964 (W.D. Tenn. 1999) ("[T]he damages remedy for a contract breach is meant to compensate the injured party, not punish the breaching party." (citation omitted)); *Hennessee v. Wood Grp. Enters., Inc.*, 816 S.W.2d 35, 37 (Tenn. Ct. App. 1991) ("An injured party is only entitled to be put in the same position he would have been in had the contract been performed[.]" (citations omitted)); *see also Rogers v. Louisville Land Co.*, 367 S.W.3d 196, 211 n.14 (Tenn. 2012) (stating that "punitive damages are not available in a breach of contract case" except in "the most egregious cases" (citation and quotation omitted)).

But Dr. Mosley's behindhand assertion of an unenforceable liquidated damages provision—which is an affirmative defense under Tennessee law, *Anesthesia Med. Grp., P.C. v. Buras*, No. M2004-01599-COA-RS-CV, 2006 WL 2737829, at *3 (Tenn. Ct. App. Sept. 25, 2006)—is a concern for the Court. Unlike Dr. Mosley's defense of setoff, this defense does not appear in his pleadings or comprise an argument that he has broached in any motion. Shelbyville Hospital now objects to Dr. Mosley's assertion of unenforceability on these same grounds, contending that Dr. Mosley "never challenged the applicability or enforceability of D.6" and has "waived any argument that D.6 does not apply." [Pl.'s Post-Hearing Br. at 8]. Also, during the hearing, Shelbyville Hospital

raised a blanket objection to any new evidence or new arguments: "[W]e object to him putting new evidence into the summary judgment record. We object to him taking new positions." [Hr'g Tr. at 7:21–22]. In addition to this objection, Shelbyville Hospital aired numerous contemporaneous objections during Dr. Mosley's testimony, insisting that the bulk of evidence that he relied on "was never disclosed" in discovery despite repeated requests for it, that his "arguments were waived," and that his actions were "grossly unfair." [*Id.* at 11:21–22, 15:3–4, 15:6–8, 21:2–3, 25:10–13, 29:19]. The Court will now revisit these objections and consider whether Dr. Mosley's affirmative defense of unenforceability is properly before it.

### 1. *Federal Rule of Civil Procedure 8(c)*

Under Federal Rule of Civil Procedure 8(c), "a party must affirmatively state any avoidance or affirmative defense" in the answer, Fed. R. Civ. P. 8(c), but under common law, a "[f]ailure to raise an affirmative defense by responsive pleading does not always result in waiver," *Smith v. Sushka*, 117 F.3d 965, 969 (6th Cir. 1997) (citing *Moore, Owen, Thomas & Co. v. Coffey*, 992 F.2d 1439, 1445 (6th Cir. 1993)). The common law's rendering of Rule 8(c) does not so much embody a migration from Rule 8(c)'s language as it does an affirmation of its purpose, which is to provide the plaintiff with notice of a defense and the chance to rebut it. *Blonder-Tongue Labs.*, 402 U.S. at 350. So long as the defendant raises a new defense at a "pragmatically sufficient time" and the plaintiff is "not prejudiced in its ability to respond," the defendant honors Rule 8(c)'s purpose, and strict compliance with Rule 8(c) is unnecessary. *Coffey*, 992 F.2d at 1445

(quotation omitted). In short, "delay alone is insufficient reason" for a court to disallow an affirmative defense; "[r]ather, the critical factors are notice and substantial prejudice." *Estes v. Ky. Utils. Co.*, 636 F.2d 1131, 1134 (6th Cir. 1980) (citation omitted).

These two factors—notice and substantial prejudice—are typically interrelated, at least to a degree: "[I]f a plaintiff receives notice of an affirmative defense by some means other than pleadings, 'the defendant's failure to comply Rule 8(c) does not cause the plaintiff any prejudice.'" *Coffey*, 117 F.3d at 1445 (quoting *Grant v. Preferred Research, Inc.*, 885 F.2d 795, 797 (11th Cir. 1989)). But not *every* offbeat attempt at notice by means other than the pleadings is free from prejudice. Again, the Sixth Circuit has recognized that a defendant should inject a new affirmative defense into a case at a pragmatically sufficient time. *Id.* Under the Sixth Circuit's jurisprudence, the central issue is whether an affirmative defense is so belated or pragmatically inopportune that it prevents, or effectively prevents, a plaintiff from responding to it at all. In other words, the central issue is prejudice itself.

For instance, in *Coffey*, a diversity suit that involved a breach of contract claim, the defendant raised an affirmative defense of fraudulent inducement in his response to the plaintiffs' motion for summary judgment—five years after the plaintiffs had filed their suit. 992 F.2d at 1445. The day after the defendant's assertion of this new defense, the district court entered summary judgment against him, finding no genuine issues of material fact in the record. *Id.* at 1443. The defendant appealed the judgment, claiming that his defense of fraudulent inducement created genuine issues of material fact that precluded summary judgment. *Id.* at 1444. On appeal, the plaintiffs argued for the first

time that the defendant had untimely raised, and waived his right to assert, fraudulent inducement. *Id.* at 1445. But the Sixth Circuit concluded that the defendant provided the plaintiffs with sufficient notice of his new defense under Rule 8(c). *Id.* at 1445–46. It reasoned that the plaintiffs "were aware" or "should have been aware" of the defense because the defendant raised it in response to summary judgment. *Id.* at 1445. It also rejected the plaintiffs' argument because they never "claimed that their case was prejudiced in any way by [the defendant's] failure to plead this defense." *Id.* at 1445.[13]

In *Sushka*, another instructive case, the district court awarded summary judgment to the defendant based on a defense that he raised for the first time just three days before trial. 117 F.3d at 968–70. The Sixth Circuit affirmed the district court's decision, citing two reasons. First, it noted that the district court had extended the trial date so that the plaintiff could respond to the defense. *Id.* at 970. Second, it viewed this opportunity to respond as a fair one—that is, devoid of prejudice—because the plaintiff had already litigated and developed the factual issues relevant to the defense in an administrative proceeding, which occurred during the district court's entry of a stay. *Id.* at 968, 970.

These cases, at least in part, underscore the importance of a plaintiff's assertion of prejudice when a defendant shoehorns a new defense into a case; without claiming prejudice, a plaintiff is in jeopardy of creating an assumption, if not a presumption, that he had adequate notice of the defense and an opportunity to respond it. *See Estes*, 636

---

[13] The Sixth Circuit, however, did not conclude *as a matter of law* that the defendant had not waived his new defense—the timing of which it described as "troublesome." *Coffey*, 992 F.2d at 1445. Instead, it allowed a jury to consider whether he had timely asserted it because, under Kentucky law, the issue of whether a defendant has raised a fraud defense at a reasonable time is a factual one. *Id.* at 1445–46.

F.2d at 1134 (calling on courts to "ascertain the exact nature of the prejudice of which plaintiff complains"). One specific type of prejudice that can overcome an ill-timed defense is an insufficient window for discovery:

> The prejudice that results . . . must be due in some way to the fact that that assertion of this defense was tardy. Such prejudice is demonstrated when a party has insufficient time to conduct discovery on a new issue raised in an untimely manner. Allowance of the amendment would then force that party to go to trial without adequate preparation on the new issue.

*Id.* (citation omitted); *see Harris v. Sec'y, U.S. Dep't of Veterans Affairs*, 126 F.3d 339, 343 (D.C. Cir. 1997) (stating that point of Rule 8(c)'s pleading requirement is to enable the plaintiff to "establish relevant facts" and "to develop in discovery . . . various responses to the affirmative defense").

### 2. *Shelbyville Hospital's Assertion of Prejudice*

Shelbyville Hospital's assertion of prejudice concerns Dr. Mosley's attempt to prove that it suffered no actual damages from the breach and instead received a five-million-dollars boon from his services. To arrive at this figure, Dr. Mosley testified that he "reviewed the bills of multiple patients," specifically 108 patients who had required magnetic resonance imaging exams and 282 patients who had required operative procedures. [Hr'g Tr. at 13:1, 14:5, 14:24–25]. According to Dr. Mosley, these were patients whom he had treated and billed "from the time [he] arrived in August 2011 through mid January 2013." [*Id.* at 14:4–5]. Shelbyville Hospital appears to object to his use of the billing information on two grounds. First, it argues that he did not produce the billing information in discovery, despite its repeated requests for it. Second, it contends

that he is relying on this evidence to fuel his new defense of unenforceability, which it labels as untimely and waived. [Pl.'s Post-Hearing Br. at 8].

i. Discovery Dispute Redux

During discovery, Dr. Mosley refused to supply Shelbyville Hospital with the billing information for his patients, even though Shelbyville Hospital requested the production of "all documents reflecting the billing and collection procedures applicable to your practice since August 1, 2011." [Def.'s Resps. Third Req. Produc., doc. 97-4, ¶ 4].[14] As the parties undoubtedly recall, they were embroiled in a discovery dispute over the production of this billing information. Shelbyville Hospital moved to compel its production, [Pl.'s Mot. Compel, doc. 80], and the Court then ordered Dr. Mosley to produce it, [Order Compelling Production, doc. 91]. Dr. Mosley, however, did not produce it. Shelbyville Hospital moved for sanctions, [Pl.'s Mot. Sanctions, doc. 97], prompting the Court to reorder its production and to forewarn Dr. Mosley of the possibility of sanctions, [Second Order Compelling Production, doc. 104].

Instead of providing Shelbyville Hospital with the billing information, Dr. Mosley produced a thumb drive "containing *all* of the data pertaining to" his practice, including his "billing records, scheduling calendar, patient records, etc." [Sanctions Order, doc. 124, ¶ 5 (emphasis added)]. Dr. Mosley told Shelbyville Hospital to "cull through all of the electronic data on the thumb drive and extract whatever electronic data might be responsive to the outstanding discovery requests." [*Id.*]. Shelbyville Hospital again

---

[14] Shelbyville Hospital also made separate, more narrowly tailored requests for patients' billing information from specific weekly periods in 2012 and 2013. [Def.'s Resps. Third Req. Produc. ¶¶ 12–20].

moved for sanctions. [Pl.'s Second Mot. Sanctions, doc. 111]. The Court described the thumb drive as a "virtual warehouse" and an "eleventh hour data dump" that was not in keeping with Federal Rule of Civil Procedure 34(b)(2)(E)(ii), which states that parties have to produce electronically stored information "in a reasonably usable form." [Sanctions Order ¶¶ 5, 6].

As a result, the Court sanctioned Dr. Mosley. [*Id.* at 5]. First, it ordered him to reimburse Shelbyville Hospital for reasonable costs associated with a forensic review of the thumb drive, up to $7,800. [*Id.*; Second Sanctions Order, doc. 132, ¶ 2]. It also required him to surrender his personal MacPractice server, from which he pulled the thumb drive's data, for a forensic review. [Sanctions Order at 5]. Second, it precluded him from relying on *physical* documents that would support his defense. [*Id.*]. Third, it required him to pay attorney's fees. [*Id.*].

Recounting these sanctions at the hearing, Dr. Mosley testified that the billing information he reviewed in reaching his five-million-dollar estimate was electronic information—not physical documentation—and that it was present on the server:

> Q: Dr. Mosley, the records that you reviewed in preparation for this hearing, were those records contained on your server?
>
> A: Yes, they were all on my MacPractice server.
>
> Q: Did you produce that server?
>
> A: I did produce that server.
>
> Q: The entire server?
>
> A: The entire server.

Q: Was physically produced to the hospital's attorneys?

A: Yes, it was.

. . . .

Q: [A]ll of the records that you reviewed in preparation for the hearing, were they produced to the hospital on your server or otherwise?

A: Yes. . . . [And] I had to pay a consultant . . . to be at their office to review the server with them.

. . . .

Q: So they not only had the server, they had a consultant at your expense to help them review those records. Is that fair, accurate?

A: That's accurate.

[Hr'g Tr. at 28:20–25, 29:1–4, 30:4–6, 30:7, 30:10–12, 30:18–21].

To the extent Shelbyville Hospital argues that Dr. Mosley did not produce the billing information or that the delivery of the server itself was an inadequate means of production, its argument is meritless. The Court's sanctions—resulting in Dr. Mosley's relinquishment of the server and payment for the forensic reviews—were a perfectly apt means of compelling Dr. Mosley's compliance with discovery. *See Sky Med. Supply Inc. v. SCS Support Claim Servs., Inc.*, CV 12-6383 (JFB) (AKT), 2016 WL 4703656, at *5 (E.D.N.Y. Sept. 7, 2016) ("Unless and until such an inspection . . . is shown to be unduly burdensome or otherwise inefficient . . . an inspection of the database comports with both the letter and the spirit of Rule 34." (citation omitted)). Shelbyville Hospital, in fact, previously acknowledged—more than a year before the hearing—that the server "has been available for inspection," that it "downloaded" documents from the server, and that

the computer containing the server was "ready to be picked up." [Letter to Dr. Mosley's Counsel, doc. 161-1, at 2]. After inspecting the server, downloading its contents, and returning the computer to Dr. Mosley, Shelbyville Hospital did not inform the Court of recurring problems or any new problems with discovery. Its attempt to do so now is at best baseless and at worst disingenuous.

## ii. Insufficient Time to Conduct Discovery

To the extent Shelbyville Hospital, however, argues that it has had "insufficient time to conduct discovery on a *new* issue raised in an untimely manner," *Estes*, 636 F.2d at 1134 (emphasis added), its argument does have merit. Again, Dr. Mosley's defense of unenforceability is a new defense. If the Court were to downplay or outright ignore the need for discovery on this defense and allow Dr. Mosley to take it straight through to trial, Shelbyville Hospital "would then [be] force[d] . . . to go to trial without adequate preparation on the new [defense]." *Id.*

"[O]ne of the purposes of discovery is to obtain information for use on cross-examination and for the impeachment of witnesses." *In re Complaint of Foss Mar. Co.*, No. 5:12-CV-21-TBR-LLK, 2015 WL 1249571, at *1 (W.D. Ky. Mar. 18, 2015) (quoting *United States v. Int'l Bus. Machs. Corp.*, 66 F.R.D. 215, 218 (S.D.N.Y. 1974)). To this point, Shelbyville Hospital is bereft of a full and fair opportunity to gather evidence on this defense and lay necessary groundwork for cross-examination and impeachment at trial. The Court struggles to envision a more barefaced form of undue prejudice that can befall a party. *See Estes*, 636 F.2d at 1134 ("Such prejudice is demonstrated when a party

has insufficient time to conduct discovery on a new issue raised in an untimely manner."); *see also Harris*, 126 F.3d at 345 ("When an opposing party does receive notice of a previously unpled defense . . . it lacks the advance notice required by Rule 8(c) that would have enabled it to develop factual and legal defenses fully.").

While Dr. Mosley might contend that additional discovery is needless because, in invoking unenforceability at the hearing, he relied on evidence that he already produced in discovery—the billing information—this evidence, frankly, does little to fortify the record with evidence of unenforceability. Unenforceability is a fact-sensitive inquiry, *see Buras*, 2006 WL 2737829 at *6–8, and it requires more than mere evidence that the nonbreaching party incurred no actual damages or that a provision yields damages that happen to be uneven with the nonbreaching party's harm, *see Guiliano*, 995 S.W.2d at 100. Rather, it requires evidence of the parties' contractual intent when they entered into the contract—based on not only the contract's language but also a prospective review of the circumstances relating to its formation: "[C]ourts must focus on the intentions of the parties based upon the language in the contract and the circumstances that existed at the time of contract formation." *Id.* (footnote omitted). The relevant "circumstances" at the time of formation include (1) "whether the liquidated sum was a reasonable estimate of potential damages" and (2) "whether actual damages were indeterminable or difficult to measure at the time the parties entered into the contract." *Id.* at 100–01 (citation omitted).

In short, these circumstances require a probe into each party's perception of damages during formation. If the liquidated damages provision meets these two factors, then it is reasonable and enforceable. *Id.* at 101. If it does not satisfy them, then it is

punitive and unenforceable as a matter of public policy. *Id.* The second factor appears to be particularly fact-intensive, if not the primary focus, in case law. *See Buras*, 2006 WL 2737829 at *7–8 (assessing whether the parties were able to "accurately predict[] at the time of contract formation" the "actual amount of damages that would result" from a breach and weighing testimony and other evidence to resolve this issue—including "how long it would take to find a permanent replacement," "salary at the time of [] resignation," "any agency fee for a permanent replacement," and "increase in the salary that would have to be paid to a permanent replacement").

Dr. Mosley simply presented no evidence of unenforceability. During the hearing, he stressed that Shelbyville Hospital has made no showing of actual damages from the breach, [Def.'s Post-Hearing Br. at 1–2], but a showing of actual damages is meaningless under the two-factor test, *see Guiliano*, 995 S.W.2d at 100 ("[I]t is unfair to require the nonbreaching party to prove actual damages in cases where the parties agreed in advance to a liquidated damages provision."). Also, while evidence from the hearing establishes that Dr. Mosley conferred a financial benefit on Shelbyville Hospital over the course of the Recruitment Agreement, the Court strains to understand how this evidence bears on the issue of unenforceability, which concerns damages and not benefits. He needed to mount evidence showing that when the parties entered into the Recruitment Agreement, they were fairly and accurately able to *predict* the actual damages for a breach under paragraph B.4. *Guiliano*, 995 S.W.2d at 99, 101; *Buras*, 2006 WL 2737829 at *7–8. He never touched on this point.

The evidentiary hearing, then, did nothing to brace the record with evidence of unenforceability and diminish Shelbyville Hospital's need to perform discovery on this new defense before trial. Shelbyville Hospital remains unduly prejudiced by its inability to perform discovery on this defense. And even if the lack of discovery is not unduly prejudicial, Dr. Mosley still cannot proceed to trial with this defense because he did not introduce evidence supporting it, entitling Shelbyville Hospital to summary judgment on it. *See Celotex*, 477 U.S. at 325 (recognizing that summary judgment is proper when there is "an absence of evidence to support the nonmoving party's" claims or defenses); *Pliley v. Sullivan*, 892 F.2d 35, 37 (6th Cir. 1989) (stating that a sua sponte award of summary judgment is "a proper procedure" so long as the party opposing summary judgment has had a chance to argue against it); *see also United States v. Jones*, 260 F. App'x 769, 774 (6th Cir. 2008) ("The purpose of an evidentiary hearing is to present evidence in the possession of the requesting party[.]").

Because Dr. Mosley's new defense of unenforceability is untimely and unduly prejudicial to Shelbyville Hospital, the Court considers it waived. Also, along similar lines, Dr. Mosley has arguably violated Local Rule 38.3 by summoning this fact-intensive defense en route to trial. *See* E.D. Tenn. L.R. 38.3 ("Counsel shall give advance notice to the Court of any anticipated questions of law or evidence which might delay the trial."); *see also Hollingsworth v. Perry*, 558 U.S. 183, 191 (2010) (recognizing that a district court's local rules have "the force of law" (quotation omitted)). For all these reasons, the Court will not permit Dr. Mosley to assert unenforceability as a defense at the trial on damages.

## IV.  CONCLUSION

As the movant for summary judgment, Shelbyville Hospital fails to discharge its burden, which requires it to establish, beyond a genuine issue of material fact, its right to recover damages under paragraph D.6. Specifically, paragraph D.6 requires it to show that Dr. Mosley, during the first eighteen months, did not contribute an average of forty hours per week to the Full-Time Private Practice of Medicine. Neither its arguments nor its evidence is sufficient to support this showing. As a result, the Court will schedule a trial on damages. The Court orders as follows:

1. Shelbyville Hospital's Motion for Compensatory Damages and Interest [doc. 178] is **DENIED**.

2. A trial of this case will be held before the undersigned and a jury on Tuesday, April 10, 2018, at 9:00 a.m., in Courtroom 1A of the Howard H. Baker, Jr. United States Courthouse in Knoxville, Tennessee.

3. A final pretrial conference will be held before the undersigned on Monday, March 26, 2018, at 11:00 a.m., in Courtroom 1A of the Howard H. Baker, Jr. United States Courthouse in Knoxville, Tennessee.

4. To the extent Shelbyville Hospital requests summary judgment on Dr. Mosley's affirmative defense of setoff, that request is **GRANTED**.

5. At trial, the Court will not permit Dr. Mosley to argue that he is entitled to a setoff or that the Recruitment Agreement contains unenforceable liquidated damages provisions.

6. Shelbyville Hospital's Motion for Attorney's Fees and Costs [doc. 179] is **DENIED** with leave to renew after the trial.

7. To the extent applicable, all unexpired deadlines relating to pretrial and trial matters in the Court's Amended Scheduling Order [doc. 72] remain in effect. The parties shall calculate all unexpired deadlines from the new trial date.

8. The stay of this action is hereby **LIFTED**.

     **IT IS SO ORDERED.**

ENTER:


_____s/ Thomas W. Phillips_____
United States District Judge